(No. 74980.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GUINEVERE A. GARCIA, Appellant.

*Opinion filed March 23, 1995.—Rehearing denied May 30, 1995.*

412

FREEMAN, J., joined by McMORROW, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Rosalyn B. Kaplan, Solicitor General, and Arleen C. Anderson and Michael A. Hurst, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, the defendant, Guinevere A. Garcia, was convicted of first degree murder by the jury, as well as unlawful use of a firearm by a felon by the trial court. The defendant waived her right to a jury for the sentencing phase of her trial. After presentation of evidence by the State and the defendant, the trial court found insufficient mitigating factors and sentenced the defendant to death, as well as a term of 10 years for the unlawful use of a firearm by a felon. Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). We affirm defendant's convictions and sentences.

On appeal to this court, defendant argues that: (1) she was too intoxicated to knowingly and intelligently waive her *Miranda* rights; (2) her statements during processing were inadmissible responses to interrogation after her *Miranda* warnings previously given had become stale; (3) the trial court erred in only allowing seven peremptory challenges after defendant had waived her right to have a jury sentence her; (4) she

should have been allowed to testify at trial about the statements of the victim to her to show she had shot the victim under a sudden and intense passion that he had provoked; (5) the trial court should have offered defendant's tendered instruction that "a voluntary act is a material element of every offense"; (6) the trial court improperly weighed the aggravating and mitigating evidence in determining that defendant should be sentenced to death; (7) the trial court improperly denied defendant the right to allocution; and (8) the Illinois death penalty statute is unconstitutional.

## FACTS

The following facts were adduced at the guilt and sentencing phases of defendant Guinevere Garcia's trial. Only facts and testimony relevant to the resolution of issues raised by the defendant are summarized below.

In March of 1991, the defendant, Guinevere Garcia, was released from the Illinois Department of Corrections after serving 10 years of a 20-year sentence for the murder of her 11-month-old daughter and for four aggravated arsons. Shortly after her release, she married George Garcia (the victim), 26 years her senior, for the second time. The defendant had met George Garcia while she was a prostitute. The defendant lived with her new husband in Bensenville for several weeks before leaving him and moving in with her grandparents in Chicago. Defendant then commenced a relationship with John Gonzalez, who was a security guard with the Chicago Housing Authority.

On July 22, 1991, the defendant was at her grandparents home drinking alcohol on the porch with her uncle, Tom Coutee, her ex-boyfriend, Mike Garber, and her new boyfriend, John Gonzalez. Having left for a while, Gonzalez later returned to the defendant's residence and she left with him early the next morning, July 23, 1991, around 12:15 a.m. They drove to Gonzalez's

place of work, where he learned that he was too late for his shift and that his replacement had arrived. They then went to defendant's bank to retrieve money, but were unsuccessful. Defendant then directed Gonzalez to drive to Bensenville where her husband was living, though she did not tell Gonzalez exactly where they were headed or whom she intended to see. She merely stated that she knew where they could get some money.

Upon arriving at the parking lot of her husband's apartment building, defendant saw him and said hello. She then grabbed Gonzalez's .357 Magnum pistol, which was between her and Gonzalez in the front seat, got out of the car and forced her husband to turn around and get into his pickup truck. While seated in the truck, an argument immediately ensued during the course of which there was allegedly a struggle for the gun. The defendant then shot the victim at point-blank range one time in the chest. He staggered out of the truck and fell onto the pavement where he bled to death. Before leaving the scene, she took the keys to his truck. According to Gonzalez, the entire incident in the truck lasted approximately 30 seconds. When the defendant returned to the car, she told Gonzalez, "That motherfucker deserves to die."

The defendant drove Gonzalez's car from the murder scene back to her grandparents' house in Chicago. During the drive, defendant discarded the empty shell casing out the window. After she arrived home, she commenced calling the victim's answering machine starting at 3:39 a.m. In the course of these calls, defendant left messages for George expressing her love for him. Throughout the early morning, defendant continued to drink.

Later that morning, after the Bensenville police department learned of the victim's murder, the defendant and Gonzalez came voluntarily to the Bensenville

police department to answer some questions. Defendant's uncle, Tom Coutee, drove the car. During the trip, the defendant allegedly consumed four beers. Upon reaching the police department at approximately 8:15 a.m., defendant answered questions until she left the station around 12:30 p.m. During the course of her answers, defendant voiced several times that she wanted to get the person responsible for her husband's death. She also told her uncle that she believed John Gonzalez was the killer.

Defendant and Gonzalez left the police station and headed home to Chicago, again driven by Coutee. During the ride home, defendant consumed two or three more beers. Several hours after arriving home, defendant and Gonzalez went to the Beehive Lounge to have some drinks. An hour or so after arriving at the Beehive Lounge, defendant telephoned the Bensenville police from a pay phone and stated that Gonzalez had just told her that he had killed her husband so he could have the defendant all to himself. When the police arrived at approximately 4:30 p.m., defendant pretended to be overcome with grief and anger. Both defendant and Gonzalez were arrested and read their *Miranda* warnings, which defendant acknowledged she understood. The Bensenville police told defendant she was not really under arrest but to go along with the ruse for Gonzalez's sake. They were both then taken to the Bensenville police station.

At 6 p.m., defendant was again issued *Miranda* warnings, signed a card indicating that she had read and understood her rights, and proceeded to give a handwritten and tape-recorded statement to the police stating that Gonzalez had killed her husband. In a separate room, Gonzalez told the police that it was the defendant who had shot the victim. At 10:30 p.m., defendant was informed that she was under arrest for the

murder of her husband, George Garcia. It is uncontroverted that, up to this point, defendant was not under arrest and believed that she could leave at any time. She was once again issued *Miranda* warnings, which she acknowledged she understood and then produced a written confession admitting that it was she, and not Gonzalez, who had shot her husband.

Several hours after defendant's confession, she was processed by Officer Neuberg at the Bensenville police station. Defendant was shaking, thus making it difficult for Neuberg to fingerprint her. Neuberg asked the defendant why she was shaking and the defendant answered that she had just shot her husband. Neuberg then asked defendant what kind of gun she had used and where she had gotten it, to which the defendant answered it was a .357 Magnum and that she had gotten it from a friend.

Prior to her trial for first degree murder and unlawful use of a firearm by a felon, defendant moved to suppress her statements and confession, arguing that she was too intoxicated to knowingly and intelligently waive her *Miranda* rights. Additionally, defendant sought to suppress the statements made in response to Officer Neuberg's questions because her *Miranda* warnings at 10:30, if valid, had gone stale. The trial court denied all these motions. Also, because defendant waived her right to have a jury impose her sentence, wishing only to have a jury for the guilt phase of the trial, the trial court allowed only seven peremptory challenges instead of 14, to which the defendant objected. Defendant did not, however, exhaust all seven of the challenges that she was allowed.

At trial, various persons testified to the foregoing facts. In addition, defendant attempted to introduce the contents of the conversation between her and her husband before she shot him to establish that she killed

him while under a sudden and intense passion resulting from an intense provocation. The trial court, however, refused to allow her to testify as to the victim's words. Defendant was, however, allowed to testify as to words she spoke in the conversation, as well as about the alleged physical altercation between the defendant and the victim as they struggled over the gun.

After the close of all the evidence, the jury was instructed on first degree murder, second degree murder and involuntary manslaughter. The trial court refused defendant's tendered non-Illinois Pattern Jury Instruction that a voluntary act is a material element of every offense. The jury convicted defendant of first degree murder and the court convicted defendant of unlawful use of a firearm by a felon on July 27, 1992. Defendant's motion for a new trial was denied on September 14, 1992.

An eligibility and sentencing hearing took place on October 7, 1992. At the sentencing phase, in aggravation, the State called three witnesses: Simon Falakassa, the defendant's former husband, Detective George Graham of the Chicago police department and Terry Chiganos, formerly an assistant State's Attorney in Cook County. Falakassa testified that he and his girlfriend were the victims of an armed robbery by the defendant, during which defendant and an accomplice tied them up and he was pistol-whipped by defendant. The defendant was subsequently convicted of robbery and sentenced to probation. Detective Graham testified that he was assigned to the bomb and arson division of the Chicago police department in the late 1970s. He investigated and eventually solved, in 1981, four aggravated arsons set by the defendant and the homicide of her 11-month-old daughter. The child's cause of death had been ruled accidental suffocation four years earlier because defendant had told the police that her daughter had been left

alone in a room where she wrapped herself around a plastic bag and suffocated. In 1981, however, the defendant confessed to the murder of her daughter and to the four aggravated arsons. This confession was transcribed in the presence of Graham and Chiganos, the transcript of which was considered by the sentencing judge in the instant case. The trial court determined that defendant was eligible for the death penalty.

In mitigation, the defendant presented evidence which showed, *inter alia*, that she suffered from depression, alcoholism and a borderline personality disorder. Also, it was shown that defendant had been sexually abused by an uncle from six years old up through her early teens. Finally, defendant presented testimony evidencing her good behavior while in custody for the instant murder trial. The defendant was not allowed an opportunity for allocution on motion of the State, to which defendant objected. The judge found the evidence insufficient to mitigate against imposition of the death penalty and sentenced defendant to death.

## ANALYSIS

### I. Claim Defendant Was Too Intoxicated to Knowingly and Intelligently Waive Her
#### *Miranda* Rights

Defendant alleges that the trial court erred in denying the motion to suppress her confession and various other pretrial statements on the basis that she was too intoxicated at the time she made the statements to knowingly and voluntarily waive her rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

In support of her contention that she was too intoxicated to knowingly and intelligently waive her *Miranda* rights, defendant recounts the nature and quantity of alcohol she consumed prior and subsequent

to her husband's death. She started drinking with John Gonzalez around noon on July 22, 1991. At 12:15 the next morning, July 23, 1991, defendant and Gonzalez went to Gonzalez's job and learned that he had been replaced because he was late. They then decided to get some money to continue their drinking. When their attempts at the cash station failed, defendant then decided that they should drive from Chicago to Bensenville so that she could get some money from her husband.

Upon arriving at her husband's apartment complex, they observed him getting into his truck. She got out of the car with Gonzalez's gun and got into the truck with her husband. After shooting him, the defendant got into the car and drove herself and Gonzalez back to Chicago. Upon arriving there, she allegedly continued drinking through the night. Her uncle, Tom Coutee, observed her in what he deemed an intoxicated state at 3 a.m. and at 6 a.m. later that day. After the defendant told him that her husband had been shot and this was confirmed by the Bensenville police department, Coutee drove the defendant and Gonzalez to the Bensenville station.

On the way to the police station, defendant allegedly consumed four beers in the car. They arrived at the Bensenville station at approximately 8:15 a.m., where the defendant remained, voluntarily, till 12:30 p.m. During her time at the station, defendant did not have anything to drink. On the way back to Chicago from the station, defendant consumed two or three additional beers. Upon arriving at her house in Chicago, defendant had some coffee made by her uncle.

Mid-afternoon, defendant and Gonzalez decided to go to the Beehive Lounge. While there, they consumed a series of $2 screwdrivers (vodka and orange juice). The exact amount consumed by defendant is uncertain. However, defendant estimates that she and Gonzalez drank $30 worth of these drinks based upon the amount

of money she had left upon her subsequent arrest. An hour or so after their arrival at the Beehive Lounge, the defendant called the Bensenville police and fingered Gonzalez as the murderer. Shortly thereafter, at approximately 4:30 p.m., defendant and Gonzalez were arrested by the Bensenville police. It is uncontroverted that the defendant was issued *Miranda* warnings and responded that she understood the warnings. Defendant was also told at this time, however, that she was really not under arrest and that she should go along with the ruse for the sake of Gonzalez.

One and a half hours after her arrest, at 6 p.m., defendant was again issued *Miranda* warnings, after which she gave a tape-recorded and handwritten statement to the Bensenville police. These statements implicated John Gonzalez in the murder of her husband. However, $4^1/2$ hours later, at 10:30 p.m., defendant was placed under arrest for the murder of her husband. She was then again issued *Miranda* warnings, after which she provided a second statement in which she confessed that it was she, and not John Gonzalez, who had shot her husband.

Early the next morning, at 1 a.m., Officer Neuberg was processing the defendant, who was shaking violently. Officer Neuberg asked the defendant why she was shaking and whether there was anything that she could do to help. The defendant responded that she had just shot her husband and, in response to further questioning, admitted that she had used a .357 Magnum.

Based upon the quantity of alcohol consumed, defendant argues that she was too intoxicated to knowingly and intelligently waive her *Miranda* rights. The law is well settled that where a suspect is so grossly intoxicated that she no longer has the capacity to waive her rights, any statements made while in this condition will be suppressed. (*People v. Roy* (1971), 49 Ill. 2d 113, 116; see

*People v. Kincaid* (1981), 87 Ill. 2d 107, 119.) However, intoxication alone does not warrant suppression; rather, the suspect must be so grossly intoxicated that she lacks capacity to waive her rights.

Initially, it should be noted that defendant's statements during her first visit to the Bensenville police station around 8:15 a.m. on July 23, 1991, are not subject to her *Miranda* claims because, as the defendant herself stated at trial, she came to the station voluntarily and understood that she was free to leave at any time, which she did several hours later. Likewise, her written and oral statements at 6 p.m. on July 23, 1991, fingering Gonzalez for her husband's murder were not subject to *Miranda* warnings because, as defendant testified, she understood she was not under arrest at the time of this statement and was free to leave. Thus, no basis exists for arguing that any of the statements by defendant during these time periods can be suppressed because defendant was not in custody when they were made.

Turning, then, to defendant's statements after being arrested at approximately 10:30 p.m. on July 23, 1991, we note that it is the function of the trial judge to determine the credibility of the witnesses at a suppression hearing and to resolve any conflicts in their testimony. The determination whether the defendant knowingly and intelligently waived her *Miranda* rights depends upon the totality of the particular facts and circumstances of the case, and the trial court's finding that the defendant possessed the capacity to waive her rights should not be disturbed unless it is concluded that the finding was against the manifest weight of the evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 289.

Considering the evidence, we find that the trial court's determination that the defendant knowingly and intelligently waived her *Miranda* rights is supported by the evidence and is not against the manifest weight of

the evidence. At the time of the defendant's arrest at 4:30 on July 23, 1991, she had been drinking steadily for several hours. Yet, defendant recalls her arrest at 4:30 p.m. and that she was read her *Miranda* rights. One and a half hours later, at 6 p.m., she was again issued *Miranda* warnings, which she testified at trial she remembered receiving. At this point she gave her first custodial statement, which was both written in her own hand and recorded.

The trial court found that this first statement, which implicated her boyfriend, John Gonzalez, was both legible and coherent. The judge also found that her tape-recorded statement indicated that the defendant was coherent at the time of the statement and, thus, concluded that she had the capacity to waive her *Miranda* rights at all times subsequent. In response to defendant's assertion that her voice on the tape was slow and indicated she was too intoxicated to waive her rights, the judge concluded that the slowness of speech on the tape was the same slowness of speech he observed at the suppression hearing, and concluded that this did not evidence that defendant was so intoxicated that she could not knowingly and intelligently waive her *Miranda* rights. Moreover, in further support of the court's determination that the defendant possessed the capacity to waive her *Miranda* rights, we note that Detective Herion, who both arrested the defendant at 4:30 p.m. and interviewed her at 6 p.m., testified that though the defendant had clearly consumed alcohol she nevertheless appeared to understand what he said to her and to respond to his questions in a coherent manner.

Considering the record as a whole, we find that the trial court's determination that the defendant was not too intoxicated to knowingly and intelligently waive her *Miranda* rights was not against the manifest weight of the evidence. Insofar as the trial court correctly

concluded that the defendant had the capacity to knowingly and intelligently waive her *Miranda* rights at 6 p.m., it is unnecessary for us to consider whether the defendant lacked capacity to waive her *Miranda* rights during any of the subsequent custodial interrogations, the record being devoid of any inference that defendant consumed any alcohol while in custody. Thus, we find that defendant's argument that she lacked capacity to knowingly and intelligently waive her *Miranda* rights because she was too intoxicated is meritless.

## II. Claim Regarding Admissibility of Defendant's Statements While She Was Being Processed in Preparation of Booking

Defendant next asserts that the trial court erred in not suppressing the statements she made to Officer Neuberg while being processed (fingerprinted and photographed) at the Bensenville police station because these statements were in response to custodial interrogation and she had not been given *Miranda* warnings by Officer Neuberg prior to making them.

Defendant wrote out and signed a confession after being apprised of her *Miranda* rights and waiving them for the second time while in custody at 10:30 p.m., on July 22, 1991. Two and a half hours later, at 1 a.m., on July 23, 1991, Officer Neuberg processed the defendant. Officer Neuberg did not, at any point, reread defendant her *Miranda* rights. Officer Neuberg's attempts to fingerprint the defendant were made more difficult by the defendant's continual shaking. Officer Neuberg asked the defendant why she was shaking in an attempt to ascertain whether there was something that would make the defendant more comfortable. The defendant responded that she had never shot anyone before. At this juncture, Officer Neuberg asked the defendant what kind of gun she had used and where she had gotten it. Defendant responded that she had used a .357 Magnum and that she had obtained it from a friend.

We note initially that Officer Neuberg's first question, "Why are you shaking?" did not constitute custodial interrogation. Interrogation, for *Miranda* purposes, has been defined as "any words or actions on the part of the police *** that the police should know are reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.) Here, the focus was primarily upon the reasonable perceptions of the suspect, rather than the intent of the police. (*Innis,* 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1690.) Nevertheless, Officer Neuberg's initial question was not directed at defendant's alleged crime, but, rather, constituted an innocent attempt to help the defendant. Defendant's response that she had shot her husband thus constituted a voluntary admission and cannot reasonably be construed as a response to a question likely to elicit an incriminating response to custodial interrogation.

The subsequent questions of Officer Neuberg, however, clearly constitute interrogation in that they were directed to the alleged crime, and thus reasonably likely to elicit an incriminating response. At issue, then, is whether the *Miranda* warnings given by the police to the defendant $2^1/2$ hours prior to Officer Neuberg's questions were sufficient to apprise defendant of her *Miranda* rights at the time of Neuberg's questions.

Whether, and under what circumstances, *Miranda* warnings can become stale has never been directly addressed by this court. It is generally accepted that fresh *Miranda* warnings are not required after the passage of several hours. (See 1 W. LaFave & J. Israel, Criminal Procedure § 6.8, at 520 (1984); see also *Stumes v. Solem* (8th Cir. 1985), 752 F.2d 317, 321.) This commonsense approach avoids the otherwise ridiculous situation of police officers' having to issue *Miranda* warnings prior to

each question or after every break in the questioning. Rather, the better rule is to require new warnings only in those situations where a substantial probability exists that warnings given at a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs. (See *Gregg v. State* (1974), 233 Ga. 117, 124-25, 210 S.E.2d 659, 665-66; *State v. Westmoreland* (1985), 314 N.C. 442, 447, 334 S.E.2d 223, 226.) Moreover, we hold that the totality of the circumstances should be looked to in determining whether given defendants understand their constitutional rights in post-*Miranda* warning interrogations. See, *e.g.*, *Upton v. State* (1974), 257 Ark. 424, 429, 516 S.W. 2d 904, 907-08.

The totality of the instant circumstances leads to the conclusion that defendant was aware of her constitutional rights to silence and to an attorney at the time she answered Officer Neuberg's questions. Just $2^1/2$ hours prior to Neuberg's questions, at 10:30 p.m., defendant had received, understood and waived her second set of *Miranda* rights. Moreover, her written confession at that time was consistent with her statement to Officer Neuberg that she had shot her husband. Finally, we note the defendant's broad experience with the criminal justice system, evidencing further that she understood that she still had the right to remain silent and to an attorney at the time of Officer Neuberg's questions.

Thus, we conclude that, to the extent that Officer Neuberg's questions constituted custodial interrogation, they were not violative of defendant's *Miranda* rights because the previous *Miranda* warnings were still in effect.

### III. Claim That Trial Court Erred in Only Allowing Seven Peremptory Challenges

Defendant next argues that the trial court erred when it only allowed seven peremptory challenges in

violation of Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)), which requires that defendants in capital cases receive 14 peremptory challenges. The basis for the trial court's peremptory challenge ruling was a series of appellate court opinions holding that seven peremptory challenges are sufficient where a capital defendant waives the right to have a jury impose the sentence. (See *People v. Allen* (1989), 184 Ill. App. 3d 438; *People v. Bae* (1988), 176 Ill. App. 3d 1065.) Defendant argues that these cases contravene the plain language of Supreme Court Rule 434 and that, in following them, the trial court erred.

This court need not reach the merits of defendant's peremptory challenge argument, however, because defendant suffered no prejudice as a result of the trial court's ruling. Notwithstanding that defendant was afforded only seven, as opposed to 14, peremptory challenges, defendant did not exhaust her peremptory challenges during jury selection. Thus, because defendant did not use all seven of her peremptory challenges, she cannot now claim prejudicial error because she was not allowed 14 peremptory challenges. See *People v. Ford* (1960), 19 Ill. 2d 466, 475 (defendant not prejudiced by composition of the jury where he had not exhausted his peremptory challenges).

Additionally, we note that defendant has otherwise failed to preserve the issue for appeal. Defendant objected neither contemporaneously at trial nor in her post-trial motion to only receiving seven peremptory challenges. Thus, she has waived this issue on appeal. *People v. Herrett* (1990), 137 Ill. 2d 195, 209; *People v. Stewart* (1984), 104 Ill. 2d 463, 488.

### IV. Claim That Defendant Should Have Been Allowed to Testify Regarding the Victim's Statements to Her Before She Shot Him

Defendant next contends that the trial court erred in precluding her from testifying about the victim's

statements to her before she shot him. At trial the judge only allowed evidence of the defendant's statements to the victim and not his statements to her just prior to his murder. Defendant argues that these statements were admissible in that they supported her contention that she acted under a sudden and intense passion when she shot her husband. This state of mind was relevant because one of defendant's defense theories was that she was guilty only of second degree murder as opposed to first degree murder. At the close of the evidence the defense argued, and the trial judge instructed the jury, *inter alia,* that it could find defendant guilty of second degree murder if it found that "[a]t the time of the killing [she was] acting under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9—2(a)(1) (West 1992).

Though not admitted into evidence, the contents of the conversation between the defendant and the victim prior to her shooting him were properly preserved in an offer of proof to the trial court. While sitting in the truck with her, the victim allegedly told the defendant that he wanted her to come back and live with him; he did not mind if defendant was sleeping with Gonzalez so long as defendant was getting paid for it and he did not mean anything to her; and he, the victim, only gave her money and attention in return for sexual favors. Defendant sought to have these statements admitted so that the jury could decide whether they were sufficient to show that defendant was impassioned at the time of her crime.

We note initially that the trial court did not set forth its legal basis for excluding the victim's statements to the defendant before she shot him. Nevertheless, given that defendant sought to admit the evidence to establish the material issue of her state of mind at the time of

the crime, we hold that the trial court erred in not allowing the statements into evidence. Defendant was entitled to present this evidence to the jury in order that the jury might conclude defendant was acting under a sudden and intense passion when she shot the victim. However, the exclusion of this evidence by the trial court does not necessarily warrant a new trial in defendant's case. This is because the improperly excluded statements are relevant only to defendant's claim that she shot the victim under a sudden and intense passion. Even if this court were to presume that the excluded evidence would have shown that the defendant acted under a sudden and intense passion, the exclusion is harmless unless the defendant could have satisfied the second element of the second degree murder statute: that the sudden and intense passion resulted from *serious provocation* by the victim. 720 ILCS 5/9—2(a)(1) (West 1992).

For, passion on behalf of the defendant, no matter how violent, will not relieve the defendant of culpability for first degree murder unless it is engendered by provocation which the law recognizes as reasonable. (*People v. Austin* (1989), 133 Ill. 2d 118, 125.) The only categories of provocation recognized by this court are substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. (*People v. Fausz* (1983), 95 Ill. 2d 535, 539; *People v. Chevalier* (1989), 131 Ill. 2d 66, 71; *People v. Simpson* (1978), 74 Ill. 2d 497.) Although these categories were originally components of the predecessor offense of voluntary manslaughter, they apply equally to second degree murder, which has essentially the same elements. *People v. Tenner* (1993), 157 Ill. 2d 341, 371-72.

The serious provocation category relevant in the instant case is "mutual quarrel or combat." By mutual combat, mere words are not contemplated. Words, in

and of themselves, no matter how vile, can never constitute serious provocation such that second degree murder should be found instead of first degree murder. (See *Tenner*, 157 Ill. 2d at 371.) Rather, the words (and we note that those used in the instant case were by no means inflammatory) must be accompanied by mutual combat so serious that it mitigates against finding the defendant guilty of first degree murder.

Whether mutual combat is serious enough to rise to this level is, generally, a matter for the jury. In the instant case, the trial court allowed into evidence all of defendant's testimony, oral and otherwise, that related to the alleged mutual combat between the defendant and the victim just prior to her shooting him. Defendant alleged that she did not produce the gun until they were inside the truck, whereupon the victim struck the defendant. Defendant alleges that a struggle then ensued whereupon the victim was shot once in the chest.

Notwithstanding this evidence, the jury convicted the defendant of first degree murder instead of second degree murder. We find this verdict in accord with the evidence. The evidence of mutual combat offered by the defendant, even when cast in the light most favorable to the defendant, is insufficient as a matter of law to justify an intense and sudden passion in a reasonable person. Thus, though the defendant may well have been impassioned, the passion was unreasonable in light of the level of mutual combat to which the defendant testified. As a consequence, while the trial court erred in not admitting evidence of the victim's words to the defendant prior to her shooting him, this error was harmless given that, no matter how impassioned the defendant, the evidence of mutual combat was insufficient to mitigate in favor of finding defendant guilty of second degree murder.

## V. Claim That Trial Court Erred in Refusing to Instruct the Jury That a Voluntary Act Is a Material Element of Every Offense

Defendant next argues that the trial court erred in refusing to tender the following nonpattern jury instruction: "[a] material element of every crime is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which she is physically capable of performing." Defendant argues that refusing to tender this instruction was error because the remaining instructions, combined, had the effect of requiring the jury to convict defendant of first degree murder even if it found that her acts were accidental.

Unfortunately, the defendant does not point out how it is that the instructions as a whole combine to require the jury to find her guilty of first degree murder even if it were to find that she shot the victim accidently. Our review of the instructions evidences that the instructions used were the standard Illinois Pattern Jury Instructions typically employed where a defendant has been charged with first degree murder, second degree murder and involuntary manslaughter.

It is the first degree murder instruction that defendant asserts predisposed the jury to find her guilty of knowing murder even were it to find that she shot the victim accidentally. She sets forth the following portion of that instruction in support of her argument:

"To sustain the charge of first degree murder, the state must prove the following propositions:

First: That the defendant performed the acts which caused the death of George Garcia; and

Second: That when defendant did so she knew that such acts created a strong probability of death or great bodily harm to George Garcia."

Considering the instruction, defendant contends it requires the jury to convict the defendant of first degree murder even if the jury concludes that she accidentally shot her husband, if it also concludes that she knew

that accidentally shooting the victim created a strong probability of death or great bodily harm. Consequently, she argues that the trial judge should have tendered her nonpattern instruction which would have told the jury that a material element of every crime is a voluntary act.

We note initially that whether to issue a specific jury instruction is the province of the trial court and that a judge's refusal to issue a nonpattern jury instruction to the jury will not be reversed on appeal absent an abuse of discretion. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 282.) A trial court's decision to reject a nonpattern jury instruction is not an abuse of discretion where the instructions submitted adequately cover the issue for which the rejected instruction is offered. (See *People v. Tsombanidis* (1992), 235 Ill. App. 3d 823, 838.) Thus, it must be considered whether the instructions issued were sufficient to inform the jury that it should not convict defendant of first degree murder in the event that it found she fired the gun accidentally, and not intentionally. We find that they did.

An instruction on accident is not required where the jury is instructed on the elements of a crime and that the State bears the burden of proving a culpable mental state on the part of the defendant. (*People v. Nutall* (1980), 91 Ill. App. 3d 758; accord *People v. Milner* (1984), 123 Ill. App. 3d 656 (instruction on negligence not required where jury informed it must find defendant not guilty of homicide if requisite mental state for the charged homicide offenses was lacking).) The instant trial judge, using predominantly Illinois Pattern Jury Instructions, informed the jury of the elements of first degree murder, second degree murder and involuntary manslaughter.

As regards the first degree murder instructions, the trial court informed the jury on several occasions in the

course of issuing the instructions that the State had to prove every element of the offense beyond a reasonable doubt and that the defendant had no burden to prove her innocence. In addition, the court informed the jury that, in the event that it did not find that the State proved beyond a reasonable doubt all the elements of first degree murder, it could not then consider whether defendant was guilty of second degree murder. If, however, the jury found that the State had proved all the elements of first degree murder beyond a reasonable doubt, it should then determine whether the defendant had proven by a preponderance of the evidence that her actions were the result of a sudden and intense passion coupled with a serious provocation. The jurors were instructed that if they found such mitigating evidence, they should convict the defendant of second degree murder. Finally, the jurors were instructed as to the definition of involuntary manslaughter and further instructed that an accidental firing was not sufficient to constitute recklessness, as used in the manslaughter instruction.

We find that the court's admonition to the jury that the State had to prove all the elements of first degree murder beyond a reasonable doubt, and that the defendant had no burden to disprove the first degree murder charges levelled against her, sufficient to prevent the jurors from finding defendant guilty of first degree murder for shooting the victim accidentally. Under the instructions, an accident is insufficient to convict the defendant of first degree murder. Rather, they provide that defendant could only be convicted of first degree murder upon finding that she performed the acts which caused the death of George Garcia and that when she did so she knew that such acts created a strong probability of death or great bodily harm to George Garcia.

The rejected voluntary act instruction simply would have told the jury that the defendant must be found not

guilty if the requisite mental state is found lacking to establish the offense of first degree murder. Indeed, it merely constitutes an inverted way of instructing the jury as to the elements of first degree murder and that the State had the burden of proving that these elements exist beyond a reasonable doubt. (*Cf. People v. Witherspoon* (1973), 55 Ill. 2d 18, 24 (finding that a separate instruction on death by misadventure was unnecessarily duplicative).) The jury here was adequately instructed as to the essential elements and mental states of the offenses charged by the State. Accordingly, the trial court did not err in refusing to issue defendant's proposed voluntary act instruction.

## VI. Claim That the Trial Court Improperly Weighed the Aggravating and Mitigating Factors

Here, defendant first contends that her death sentence was improper because the judge gave excessive weight to the aggravating factor of defendant's previous murder of her 11-month-old child and the unsubstantiated suggestion by the State that the death was agonizing. Defendant further asserts that she should not have been sentenced to death because the court gave insufficient weight to the mitigating factors of her depression and borderline personality disorder, her alcoholism, the sexual abuse she suffered as a child and her good conduct while in prison during the instant trial and while awaiting sentencing.

When reviewing a sentence of death, this court makes an independent evaluation of the record, but will not overturn a trial court's imposition of the death penalty where amply supported by the evidence. (*People v. Odle* (1988), 128 Ill. 2d 111, 137.) We agree with the trial court that there were insufficient mitigating factors to preclude imposition of the death penalty in this case.

Defendant's claim that the trial judge placed too much emphasis on defendant's previous murder of her 11-month-old child is not supported by the record. While the trial court did note the unnatural nature of that crime and comment that the child must have suffered an agonizing death, the record does not evidence that it was this crime alone which led the trial judge to impose the death penalty.

Rather, the trial court carefully considered the defendant's checkered criminal history sequentially as it led up to the instant victim's death. At the age of 18, defendant was convicted of prostitution. While on probation for this offense, she murdered her daughter by suffocating her because she was frustrated over a custody dispute involving the child, though this crime was originally ruled accidental. The next year, at the age of 19, defendant and an accomplice tied up and robbed her former husband and his girlfriend and in the course of the robbery pistol-whipped her former husband in the head. Defendant received three years' probation for robbery, rather than a potential prison sentence, because the former husband refused to prosecute. Two years later, while still on probation, defendant twice committed aggravated arson, purportedly on the anniversaries of her daughter's birth and murder. The next year she twice again committed aggravated arson, again purportedly on the anniversaries of her daughter's birth and murder.

When the defendant finally confessed to the aggravated arsons and the murder of her daughter, she was tried and sentenced to 20 years' imprisonment for murdering her daughter and 10 years' imprisonment for each count of aggravated arson, all to run concurrently. Defendant served 10 years and was then paroled. Just four months after her release, however, defendant committed the instant murder. Considering the four previous Class X felonies perpetrated by the defendant, the

trial court found that sufficient aggravating factors existed to support imposition of the death penalty. We agree and, further, find that the trial court's references to the agonizing nature of defendant's daughter's death and the violation of natural law that this murder represented were not afforded improper weight when considered in context with defendant's expansive criminal history, all of which the trial court considered.

Nor did the trial court err in finding that there were insufficient mitigating factors to preclude imposition of the death penalty. The trial court heard and reflected upon the testimony of defendant's psychiatric expert, Dr. Rossiter, that defendant had been sexually abused for a period of years as a child, was an alcoholic, suffered from depression as well as borderline personality disorder, and was prone toward impulsive and violent behavior. In refusing to find that these factors mitigated against the imposition of the death penalty, the court noted that Dr. Rossiter stated defendant was not insane at the time she murdered the victim and, moreover, was capable of knowing that murder was wrong and of stopping herself from committing the crime. In light of this testimony, the court ruled that defendant was culpable for her actions and that her psychiatric problems, such that they were, were not sufficient to mitigate against the imposition of the death penalty. Also considering this testimony, we find that the trial court did not abuse its discretion in not finding the statutory mitigating factor of extreme mental or emotional disturbance. See *People v. Madej* (1985), 106 Ill. 2d 201.

Finally, we note that the trial court did not err in finding that the evidence of defendant's good behavior while in prison was insufficient to mitigate against the imposition of the death penalty. Defendant argues that the trial court misconstrued the function of mitigating evidence when it suggested that the reason defendant

behaved well in prison might have been her familiarity with the prison system and her knowledge that good behavior had distinct advantages in prison life. Regardless of the basis for the defendant's good behavior in prison, the nature of the defendant's crime and the evidence of her character are such that we find no reason to overturn the trial court's finding that there were insufficient mitigating factors to preclude the imposition of the death penalty.

### VII. Refusal of Trial Court to Allow Defendant Opportunity for Allocution

Defendant next argues that she was denied a fair sentencing hearing when, on motion of the State, the trial judge ruled defendant was not entitled to allocution. We note, however, that this court has consistently held that there is no statutory or constitutional right to allocution at a capital sentencing hearing. (*People v. Tenner* (1993), 157 Ill. 2d 341, 381-82; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 280-82.) Insofar as the defendant has presented no grounds warranting reconsideration of this holding, her allocution argument is without merit.

### VIII. Claim That the Illinois Death Penalty Statute Is Unconstitutional

Defendant's first unconstitutionality argument asserts that the Illinois death penalty statute (720 ILCS 5/9—1(g) (West 1992)) is unconstitutional because it places the burden on the defendant to prove that there are sufficient mitigating factors to preclude the imposition of the death penalty. This court has repeatedly stated, however, that neither the State nor the defendant bears the burden of proof at the aggravation and mitigation stage of a murder trial. (*People v. Simms* (1991), 143 Ill. 2d 154, 184.) Rather, the State bears the burden of going forward with factors in aggravation and

the defendant bears the burden of going forward with evidence of mitigating factors. (*Simms*, 143 Ill. 2d at 184; *People v. Fields* (1990), 135 Ill. 2d 18, 73.) In light of this construction of the death penalty statute, defendant's unconstitutionality argument is meritless because the sentencing determination is a weighing process in which neither party has a burden of proof.

Defendant's final unconstitutionality argument asks this court to reconsider the constitutionality of the following aspects of the Illinois death penalty statute: the discretion prosecutors have to seek the death penalty; the absence of any need for pretrial notice to the defendant that the death penalty will be sought; the limited proportionality review of death sentences; the absence of a requirement of written findings by the sentencer; that defendant need not be made aware of aggravating evidence prior to trial; the absence of the burden of proof on the prosecution at sentencing; certain language which has the effect of shifting the burden of proof to the defendant on the sentencing phase of the trial; and preclusion of the sentencer's consideration of the range of sentences applicable if the death penalty is not imposed.

However, beyond stating these potential arguments and citing to cases of this court which have upheld the constitutionality of these aspects of our death penalty statute, defendant provides no analysis suggesting why this court should reconsider the constitutionality of these provisions. Moreover, equally unpersuasive is defendant's suggestion that, though these provisions might all, individually, pass constitutional muster, taken together they are unconstitutional. This court has explicitly rejected this argument in various cases and defendant gives no reason why we should reexamine the question. *People v. Morgan* (1991), 142 Ill. 2d 410, 473.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentences. The clerk of this court is directed to enter an order setting Wednesday, September 20, 1995, as the date on which the sentence of death entered by the circuit court of Du Page County shall be carried out. Defendant shall be executed in the manner provided by law. (725 ILCS 5/119—5 (West 1992).) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is now confined.

*Affirmed.*

JUSTICE FREEMAN, partially concurring and partially dissenting:

I concur with the majority affirmance of defendant's conviction for first degree murder. I disagree, however, with the majority ruling that defendant's death sentence was appropriate. Death sentencing is always a difficult and burdensome decision, and I respect the difficulty of the task which confronted the trial court here. I do not, however, believe that the circumstances of defendant's past life and this crime warrant that she be put to death, rather than incarcerated for the balance of her natural life. There was sufficient mitigation here, some of which was not properly valued, to preclude the imposition of death.

The record reflects the following evidence. Defendant was born to an alcoholic mother who died by falling from a window when defendant was 14 months old. Defendant's father apparently abandoned both mother and child at or about this time. Defendant was raised in the home of her maternal grandparents and sexually abused by one of several uncles from around the age of six years until adolescence. She developed a "problem"

with alcohol at around the age of 11. She apparently attended school until the second year of high school, but had many fights and other interpersonal difficulties. She also had intense conflicts with her grandparents. During childhood and adolescence, defendant experienced at least three "closed head" injuries, one requiring hospitalization. According to a psychiatric examination conducted March 27, 1992, defendant appeared to have had "many, many traumatic experiences" within her life.

At the age of 16 years, defendant's grandfather gave written consent for her to be married to Simon Falakassa, aged 28 years, a student from Iran, who at the time was seeking to gain permanent residency status in the United States. Falakassa gave defendant at least $1,500 at the time of their marriage. Defendant was introduced to Falakassa by Abraham Solumani, her boyfriend.

Defendant and Falakassa lived together for about 18 months and, at least some of the time, as husband and wife. During this period, defendant, still 16 years old, became pregnant and on September 18, 1976, bore Solumani's child, Sara Swan. Defendant stopped living with Falakassa, perhaps sometime in 1977, and began living or staying with Steve Garber, an older man. On or about August 8, 1977, while 17 years old, and on probation for prostitution, defendant took her child from her grandmother's care to Garber's apartment. Defendant and Garber argued, and when he left the home, she suffocated the child by placing a plastic bag over its head. She later agreed with police that she had suffocated the child because her grandparents would try to take the child away from her. The death was subsequently considered an accidental death and the police investigation of the matter closed shortly thereafter.

Less than a year later, defendant was convicted of the armed robbery of Falakassa and his live-in girl-

friend. Falakassa, who had promised defendant that he would bear the costs of their divorce, refused to press charges and subsequently paid for their divorce.

Sometime in August 1981, a police fire investigator noticed that defendant had been present at the scene of several fires he investigated. The officer questioned defendant and she promised to telephone him, which she did. Throughout a series of telephone conversations and meetings, defendant told police that "Maurice," her pimp, had started four fires at her various residences because he wanted to intimidate her to continue prostituting.

Defendant told police that she had witnessed Maurice kill another prostitute by setting her on fire. Defendant told police that Maurice had doused the prostitute with accelerant and then thrown a match on her while they and another man were sitting in an auto. Maurice then threw the woman over the front seat of the auto, and the woman "scratched" defendant as she burned. The two men then placed the body in a plastic bag and decided to give her a religious burial, as she had said she always wanted. The trio then drove to St. Mary's cemetery, climbed the fence and buried the body in someone else's grave. Defendant told police that the name on the headstone was "Sara Garber," and she related that the stone showed birth as September 18, 1976, and death as August 8, 1977.

Police conducted an investigation of the grave and learned that the child buried there was named Sara Swan, although the headstone said "Sara Garber." They also learned that a listed address for the child had been one of defendant's addresses. Police found no other body in the grave and could find no pimp named "Maurice." At the time that police attempted to contact defendant with this information, she left a message for the investigating officer that he should look for a note under

a garbage can, located a few blocks from the police station. The officer found the note. In it, defendant confessed to suffocating her child and setting the four fires. Two of the fires were set around the anniversary of the child's birth (September 24 and 29, 1980) and two of the fires were set around the anniversary of the child's death (August 14 and 18, 1981). According to defendant's transcribed statement to police, which was admitted into evidence at sentencing in this case, she set the fires because she was "upset" about her baby. She also admitted that the fires "were done when [she was] feeling remorseful about killing [her] daughter" and agreed that was why she was "motivated" to start them.

Defendant subsequently served a term of 10 years imprisonment. Sometime during this period (April 1984), she married and divorced George Garcia, aged 52 years, a former prostitution client of hers. Although another prostitute testified that Garcia treated defendant well, defendant testified that her prior relationship with him involved physical abuse, including one episode, supported by medical records, where Garcia had allegedly placed glass inside her vaginal cavity. Defendant's medical records for the period unbelievably state that a two-inch-long laceration of defendant's vaginal and rectal wall was caused by a disposable douche. Within a month after defendant's release from prison, she remarried Garcia, but left him after about two weeks when he slapped her.

On the evening of the murder, defendant had been drinking all day and had gotten into an argument with the uncle who had sexually abused her. Mike Garber was present and stepped between the uncle and defendant, who was holding a knife. According to the State's witness, defendant was drunk both right before Garcia's murder (at around midnight) and afterwards (at around 3 a.m.).

Dr. Lyle Harold Rossiter, Jr., a forensic psychiatrist, testified at sentencing that defendant suffered from a borderline personality disorder with sociopathic features, chronic depression of many years duration, and alcoholism (supported by other medical records). Rossiter evaluated defendant to determine whether she was insane at the time of the murder. While Rossiter readily determined that defendant met the first prong of legal sanity, by appreciating the wrongfulness of her acts, he could not *readily* conclude that she met the second prong, by having the ability to conform her conduct to the requirement of law. Rossiter indicated that, although the decision was a difficult one, he had concluded that defendant was not legally insane at the time of the murder. Rossiter's opinion, based on a reasonable degree of psychiatric certainty, was, however, that defendant suffered from a very serious mental disorder and was under the influence of an extreme mental or emotional disturbance at the time of the crime.

Three deputy sheriffs employed at the Du Page County jail also testified at sentencing. They testified that defendant was made a "trusty," who assisted inmates and jail officers, based on her exemplary behavior. They testified that she was a "model inmate" and had had no violations. They described two instances where defendant had taken over gratuitously from them the task of removing both maggots and roaches from the sores of new inmates who were formerly homeless persons. They also testified that in their opinion defendant would make a peaceful adjustment to prison life.

The trial court at sentencing found that defendant was not remorseful about her child's death, only depressed. The trial court also did not find the statutory mitigating factor that defendant was under the influence of extreme mental or emotional disturbance at the time of the crime. Inasmuch as I believe that both of

these conclusions are clearly wrong, I cannot agree that the trial court engaged in a proper balancing of factors in mitigation and aggravation.

Although each death penalty case must be decided on its individual facts, this court has previously found sufficient mitigation to preclude the imposition of death where the defendant had been drinking heavily; had a history of shooting a revolver between his son's legs and stabbing a woman with a knife; and had then killed his wife and child by fire in a fit of rage, triggered by her alleged infidelity. (See *People v. Buggs* (1986), 112 Ill. 2d 284; see also *People v. Leger* (1992), 149 Ill. 2d 355 (physically deteriorating middle-aged defendant, previously convicted of battery against ex-wife, with history of abuse of both ex-wife and current wife, and threats against others, killed wife and ex-wife, while intoxicated and taking many prescription medications); *People v. Carlson* (1980), 79 Ill. 2d 564 (physically and mentally deteriorating middle-aged defendant, without prior criminal history, killed ex-wife, set arson fire and killed police officer after realizing that wife actually had boyfriend).) This court should be sensitive to the fact of female pathologies as mitigation just as well as male pathologies. Defendant here was long-suffering from a mental disturbance of a nature which was just as compelling as that of these other defendants. Her chaotic troubled life and her good adjustment to structured incarceration indicate that she need not be put to death.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.