SIXTH DIVISION
March 31, 2008

No. 1-07-2784


THE PEOPLE OF THE STATE OF        )       Appeal from the
ILLINOIS,                         )       Circuit Court
                                  )       of Cook County.
      Plaintiff-Appellant,        )
                                  )
      v.                          )       No. 02 CR 15430
                                  )
JAMES DEGORSKI,                   )       The Honorable
                                  )       Vincent M. Gaughan
      Defendant-Appellee.         )       Judge Presiding.


      JUSTICE O'MALLEY delivered the opinion of the court:

      Defendant, James Degorski, was indicted on 21 counts of

first degree murder for the January 8, 1993 murders of seven

individuals at a Brown's Chicken restaurant in Palatine,

Illinois.  Defendant moved to quash his arrest and suppress an

oral and videotaped statement.  The circuit court denied all but

defendant's motion to suppress his videotaped statement.  The

State filed a notice of appeal and a certificate of substantial

impairment.  The State argues that the circuit court erred in

suppressing defendant's entire videotaped statement because

defendant previously had been admonished and re-admonished of his

constitutional rights and it was neither necessary nor consistent

with Illinois law to require new Miranda warnings before

commencing the videotaped statement.  Defendant contends that the

circuit court's finding that Miranda warnings were required prior

to the videotaped statement was not against the manifest weight

of the evidence.  For the reasons that follow, we reverse the ruling of the circuit court and remand this matter for further proceedings consistent with this opinion.

BACKGROUND

On June 11, 2002, defendant was charged with 21 counts of first degree murder in the shooting and stabbing deaths of seven workers at a Brown's Chicken restaurant in Palatine, Illinois on January 8, 1993.  In March 2002, the Palatine police department received a lead from Anne Lockett, who claimed to be defendant's former girlfriend.  Lockett told Palatine police sergeant Bill King that shortly after the murders, defendant called her while she was in the hospital.  He told her "I did something" and that she should watch the news.  Lockett stated that all of the news coverage that night related to the murders that occurred at the Brown's Chicken in Palatine.

Approximately two weeks later, Lockett was released from the hospital and had another conversation with defendant in his bedroom, and this time, codefendant Juan Luna was also present. Defendant and codefendant told her that codefendant "wanted to ice somebody" and they picked the Brown's Chicken in Palatine because codefendant previously worked there and was familiar with the manner in which the restaurant was operated.  The defendants told Lockett that they drove to the restaurant in codefendant's car, parked behind the shopping center and carefully walked through the snow.  The two men entered the restaurant and ordered

chicken and began eating. Defendant became upset with codefendant because he was getting grease on his fingers and defendant worried codefendant would leave fingerprints in the restaurant.

Before the incident occurred, defendants went into the bathroom to put on gloves. Defendants confronted the employees with a knife and codefendant's .38-caliber gun. Lockett told King that an altercation started when one employee tried to escape by jumping over the counter and a round was fired. Codefendant told her that he slit a woman's throat and both recounted how they shot and killed two remaining victims and that defendant had to "finish off" one of the victims after codefendant shot him. Defendants told Lockett that they mopped up the floor and retrieved the shell casings. Later, defendants threw the gun used in the murders in the Fox River.

Relative to evidence that was collected at the crime scene, Lockett told King that defendant indicated that when he shot one victim, he threw up his french fries. King considered this to be an important piece of information because it could only be known to individuals who were present at the crime scene. Also recovered at the crime scene was a partially eaten piece of chicken which was found in an otherwise empty garbage bag. Based on Lockett's statement to King, defendants were asked to speak with investigators and provide buccal swabs for DNA samples, which were sent to the Illinois State crime lab for analysis.

After speaking to investigators in Palatine for more than 30 minutes on April 27, 2002, defendant indicated that he would speak with King again if necessary. On May 7, 2002, the crime lab notified King that the DNA taken from the partially eaten chicken in the garbage can matched codefendant's DNA.

After receiving the DNA analysis results, King learned that Eileen Bakalla had come forward and told authorities that defendant had admitted his involvement in the murders to her. By early May 2002, Lockett and Bakalla had testified before the grand jury about defendant's involvement in the murders. Palatine Police Chief John Koziol ordered King and Detective Dan Briscoe to locate defendant and ask him to come to Palatine to answer questions about the murders. Based on the evidence collected in the course of the investigation, King learned that defendant was living with his brother in Indianapolis. King and Briscoe drove to Indianapolis on May 16, 2002, where undercover Palatine police officers had been keeping defendant under surveillance for the previous two days. Through the surveillance King learned that defendant would park his personal vehicle in a parking lot outside Indianapolis and exchange it for a work vehicle.

Hamilton County officers and Indiana state troopers met with King and Briscoe at approximately 2 p.m. on May 16, at the parking lot where defendant was expected to exchange his vehicle. King explained to the Indiana officers that he would ask

4

1-07-2784

defendant to accompany him to Palatine to answer some question regarding the murders.  Defendant arrived at 3:30 p.m. at which time King and Briscoe approached him and asked if he would accompany them to Palatine to assist in the murder investigation. Defendant agreed and asked if he could first transfer his tools from his work vehicle, which he did.  The Indiana and undercover Palatine officers were in the area; however, they did not approach defendant with King and Briscoe.  Defendant consented to a pat-down by King to check for weapons and then entered King's car and sat in the backseat on the driver's side.

Although defendant agreed to accompany King and Briscoe to Palatine to assist in the investigation, King asked defendant to sign a consent to travel form, which he did.  Defendant was not advised of his Miranda rights.  King followed the Hamilton County officer to the highway and drove back toward Illinois.  During the ride, the three men made "small talk," but the murder investigation was not discussed during the drive to Illinois.  At approximately 8 p.m., King received a call from Koziol, who redirected them to the Streamwood police department because the news media had learned that defendant would be brought in for questioning at the Palatine police department.  King, Briscoe and defendant arrived at the Streamwood Police Department at 8 p.m. and went directly into an interview room.

Moments after arriving at the police station, King advised defendant of his Miranda rights.  Defendant stated that he

5

understood his rights and agreed to speak with King.  King interviewed defendant for about 45 minutes.  In this interview, defendant admitted to his involvement in the murders at the Brown's Chicken restaurant.  During the break, King offered defendant food, drink and the use of the facilities, all of which defendant declined.  The interview resumed at approximately 9 p.m. and continued for an additional 45 minutes when King and Briscoe left the interview room and briefed Assistant State's Attorney McHale (McHale) on the results of the interview.

At 10:30 p.m., King introduced defendant to McHale, who informed defendant that he was a prosecutor and not defendant's attorney and proceeded to administer Miranda warnings.  King left the room and McHale and defendant spoke for about an hour.  King resumed questioning defendant around midnight which lasted approximately three hours.  At 4 a.m., McHale joined King and interviewed defendant for three more hours.  At the conclusion of the interview, McHale asked if defendant would agree to have his statement video recorded, to which defendant answered that he was exhausted and wanted to sleep.  King made arrangements for defendant to sleep in his cell.  While defendant was sleeping, King went home and McHale slept on a couch in the police station.

At approximately 4 p.m., King notified McHale that defendant agreed to give a videotaped statement.  McHale prepared introductory remarks, exhibits and arranged for a videographer to tape the statement.  Prior to taping the defendant's statement,

6

McHale had defendant sign a consent form for defendant to be taped and furnished defendant with a photograph of codefendant and the consent to travel form that defendant signed on May 16, 2002.  The videotaping commenced at 4:13 p.m. and the following colloquy between defendant and McHale occurred:

"[ASSISTANT STATES ATTORNEY]: Okay; let the record reflect that today is May 17th, 2002.  We are in an inter - - interview room at the Streamwood Police Department. Present in the room with me, Assistant State's Attorney Mike McHale, are Sergeant Bill King of the Palatine Police and James Degorski.

We are here to take the statement of James Degorski concerning the investigation of the homicidal deaths of seven individuals which occurred on January 8th, 1993, at approximately 9:00 p.m., at the Brown's Chicken at 168 West Northwestern Highway in Palatine, Illinois.

Jim, before we spoke, I explained that I am an assistant state's attorney, a lawyer and prosecutor and not your lawyer, is that correct?

A. [Indicating] (Nodding)

Q. You need to answer out loud.

A. Yes

Q. Okay.  And before we spoke I advised you of your constitutional rights, is that correct?

A. Yes.

Q. Okay. I need you to just do me a favor and keep your voice up a little. Okay. Jim, I talked to you earlier and you told me about the homicidal deaths of the seven individuals. And at that time you told me in summary that you and Juan Luna planned a robbery at the Brown's Chicken in Palatine. And that during the robbery you shot two people in the cooler and Juan shot the other five and stabbed the lady. Money was taken and was split up between you later. Is that correct?

A. [Inaudible].

Q. Okay. Again, I know it's - - I know it's hard but if you could just keep your voice up for us, okay. Okay, what I just said to you then, is that correct?

A. Right.

Q. Okay, I'm gonna [sic] read you your rights again. Do you understand that you have the right to remain silent?

A. Yes.

Q. Do you understand that you have - - understand that anything you say can be used against you in a court of law?

A. Yes.

Q. Do you understand that you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yeah.

Q. Do you understand that if you cannot afford to hire a

lawyer and want one, a lawyer will be appointed by the court to represent you before any questioning.

A. [Inaudible].

Q. Understanding these rights, Jim, do you wish to talk to us now?

A. Not really.

Q. Okay. Earlier, you told us what happened, right? You spent a long time talking with Bill and myself, is that correct?

A. Correct.

Q. Okay. I gave you your rights before when I first met you, is that correct?

A. Yes.

Q. Okay. And you told me you understood your rights?

A. Yes.

Q. Okay. And I have just given those to you again. Do you wish to talk to us at this time and tell us everything you told us before?

A. I would much rather just say it in court. I just - -

Q. Okay. I want to show you what I gave you here, that's a Consent to the Videotape Statement, correct?

A. Yes.

Q. Do you see your signature on there?

A. Yes, that's my signature there on the first line.

Q. Can you point to it?

A. Right next to that X right here. [Indicating]

Q. Okay. And you basically said that you were willing to give a videostate - - statement about this case?

A. Yes.

Q. Okay. So - -

A. And on Number 1, it gave me the option to not say anything if I didn't - -

Q. Okay. What part of it?

A. I think one. That I don't have to say anything - - right to remain silent.

Q. Are you asking to remain silent? You don't want to give a video statement today at this time? It's your choice, Jim.

A. Yeah, I want to - -

Q. I guess - -

A. - - but it would it just - - it'll be easier just to say it one time - - or say it in court rather. I've already said it. It's not like I have anything to hide or whatever.

Q. Okay. This is what you and I and Bill talked before, correct?

A. Yes.

Q. Okay. It is your choice. I mean as you sit here now, you can tell me, I don't want to talk about this or I do want to talk about this. Now we've been through this before. So - -

A. I don't want to talk about - - I mean, I don't want to talk about it.

Q. So - - all right.  You realize by doing this that we are stopping the tape and we're walking out.  Is that what you want us to do?

A. Then I'll just say it in court then.

Q. Okay.  I need you to tell me what you want us to do. So you want us to stop the tape and do you want us to leave, or would you like to continue to tell us what happened? Your choice.

[pause]

A. I don't want to talk about it at this time. I - -

Q. So you - - do you understand that I'm stopping the tape and I'm walking out?  Is that what you want us to do?

A. Yeah.

Q. Yes, okay.  This now concludes the video statement of James DeGorski."

The duration of the entire videotape was 4 minutes, 32 seconds.

Based on defendant's statements, the grand jury testimony and statements from Lockett and Bakalla and evidence collected at the crime scene defendant was charged with 21 counts of first degree murder.  Defendant was subsequently transported to the Cook County jail where he was assigned a cell in division nine. During the time defendant was in custody he allegedly made a statement to a Alicia Hines, a paramedic at the Cook County jail,

regarding his involvement in the murders while receiving medical treatment.[1]  On December 13, 2006, defendant filed a motion to suppress any and all statements he made to police.  On August 20, 2007, defendant filed a motion to quash arrest and suppress evidence.

The circuit court heard arguments on defendant's motions to quash arrest, suppress evidence and suppress statements.  The court denied defendant's motions to quash arrest and suppress evidence.  However, with regard to the motion to suppress the statements, the circuit court partially granted and partially denied it.  Three components of defendant's motion were identified by the court: (1) the oral statements made to police on May 16 and 17; (2) the videotaped statement; and (3) the statement made to Alicia Hines while receiving medical treatment.  The circuit court denied defendant's motion to suppress his oral statements to police and Alicia Hines but granted his motion to suppress his videotaped statement.  The circuit court gave the following reasons for partially denying and partially granting defendant's motion:

"All right, as to the oral statements, as to the
operative paragraphs in the motion to suppress statements
filed by [defendant].  I find that the State has disproved
those paragraphs beyond a preponderance of the evidence.

---

[1]At times in the record, Hines' first name is spelled "Alesia."

12

Looking at the totality of the circumstances under which those statements were made. I find that [defendant's] will was not overborne and that his statements were made voluntarily and the evidence reflects that. As to the video tape, first - again, you have to look at the totality of the circumstances, and the attitude of the people that were questioning [defendant] and how they confronted him, and how they treated him on Page 154 of the transcript [defendant] said that he would want to get some sleep before he would make the video, and they allowed him to go to sleep. On Page 156 of the transcript [defendant] said his mind set, he said I don't like to take videos, even at parties, but I'll do it here.

So the next event is after [defendant] sleeps, the consent to video is signed and [defendant] is taken into the room with the videographer *** and [the] Assistant State's Attorney (ASA) *** and Sergeant King. There's a little colloquy before [the ASA] starts to give [defendant] his constitutional rights under Miranda and Escobedo and there is a point where it could be interpreted as not being very clear when he said not really.

You have to look at [the ASA's] conduct also. Certainly when [defendant] requested sleep, there was no problem about giving him sleep or rushing him right into video. So I think when I say it is my opinion is that there was nothing

13

unjust or unlawful or unethical about questioning it
further. [The ASA] did and the final result was [defendant]
did not want to make a video statement. So my finding there
is that whole video statement goes out as a violation of
Miranda not that it's involuntary. So that means that if
[defendant] testifies, that part of the statement can come
in."

The State properly filed its certificate of substantial
impairment pursuant to Illinois Supreme Court Rule 604(a)(1) (210
Ill. 2d R. 604(a)(1)) and now appeals the ruling of the circuit
court.

## ANALYSIS

### I. Standard of Review

Courts of review in Illinois generally apply a bifurcated
standard of review in situations where a ruling presents a mixed
question of law and fact. People v. Jones, 215 Ill. 2d 261, 267
(2005); People v. Ballard, 206 Ill. 2d 151, 162-63 (2002); People
v. Watson, 214 Ill. 2d 271, 279 (2005). In the instant case, we
are called upon to review a circuit court's ruling on a motion to
suppress, which is a mixed question of law and fact. People v.
Rivera, 227 Ill. 2d 1, 7-8 (2007). At a hearing on a defendant's
motion to suppress, the circuit court's function is to determine
the credibility of the witnesses, the weight to be assigned to
their testimony and the inferences to be drawn from the evidence.
Ballard, 206 Ill. 2d at 162-63. In determining whether a trial

court has properly ruled on a motion to suppress, the reviewing court accords great deference to the findings of fact and credibility determinations made by the circuit court which will be reversed on appeal only if they are against the manifest weight of the evidence. In re Christopher K., 217 Ill. 2d 348, 373 (2005); People v. Braggs, 209 Ill. 2d 492, 505 (2003). We review de novo, however, the ultimate question posed by the legal challenge to the circuit court's ruling on a suppression motion. People v. Nicholas, 218 Ill. 2d 104, 116 (2005).

## II. Necessity of New Miranda Warnings

The circuit court ruled that the entire video would be suppresses due to a "Miranda violation." Since it is clear that defendant received Miranda warnings in full on two occasions during previous interviews, the issue squarely presented before this court is whether the circuit court erred in ruling that ASA McHale was required to administer fresh Miranda warnings prior to commencing the videotaped statement. The State argues that the circuit court erred because re-admonishment of warnings was not required by Illinois law under the circumstances here. Defendant argues that the circuit court's finding was not against the manifest weight of the evidence because the record supports a finding that previous warnings had become stale, the admission of the videotape serves no purpose other than to remind the jury that defendant invoked his right to silence in violation of Doyle v. Ohio, 426 U.S. 610, 49 L. Ed 91, 96 S. Ct. 2240 (1976) and the

15

State impermissibly employed the "question first" and advise defendant of <u>Miranda</u> rights "later" approach under <u>Missouri v. Seibert</u>, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004).

Our supreme court has specifically addressed when, and under what circumstances, <u>Miranda</u> warnings can become stale in <u>People v. Garcia</u>, 165 Ill. 2d 409, 425-26 (1995), (citing to 1 W. LaFave & J. Israel, Criminal Procedure §6.8, at 520 (1984) and <u>Stumes v. Solem</u>, 752 F.2d 317, 321 (8th Cir. 1985), for the proposition that "[i]t is generally accepted that fresh <u>Miranda</u> warnings are not required after the passage of several hours").  The <u>Garcia</u> court further determined that it would be ridiculous to require police to re-advise an accused of his or her <u>Miranda</u> rights following each break in questioning.  <u>Garcia</u>, 165 Ill. 2d at 425-26.  The rule announced in <u>Garcia</u> is that new warnings are only required in those situations where warnings given at a previous interrogation are "so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs."  <u>Garcia</u>, 165 Ill. 2d at 426.  Furthermore, the totality of the circumstances should be addressed by the circuit court in determining whether a defendant understands his constitutional rights in post-<u>Miranda</u> warning interrogations.  <u>Garcia</u>, 165 Ill. 2d at 426, citing <u>Upton v. State</u>, 257 Ark. 424, 429, 516 S.W.2d 904, 907-08 (1974).

The record establishes that defendant had been offered food,

16

drink and visits to the facilities. McHale testified that he questioned defendant with regard to his treatment by King and the police in private and defendant responded that the police treated him fine. Defendant was advised of his rights at approximately 8:15 p.m. by King and again at approximately 10:30 p.m. by McHale on May 16 and subsequently reminded of his rights several times following the full Miranda warnings at 10:30 p.m. Following the 10:30 p.m. warnings, defendant was questioned for about an hour, and again offered food, drink and a visit to the bathroom and then interviewed by King for about three hours. After a break, King and McHale interviewed defendant for three hours and then honored defendant's request to sleep.

At approximately 3:30 p.m. on May 17, defendant told King that he would give a videotaped statement. The videotaped statement began at 4:13 p.m. on May 17, and defendant was re-advised of his constitutional rights following a summary of defendant's previous statement by McHale. According to the record, the longest period of time that could have elapsed during which defendant was not fully advised of his Miranda rights was from 10:30 p.m. on May 16, to 4:13 p.m. on May 17, or approximately 18 hours, during which defendant received "reminders" of his constitutional rights as opposed to a full warning under Miranda. After summarizing the evidence presented at the hearing, the circuit court entered a finding that "the whole video statement goes out as a violation of Miranda."

1-07-2784

We disagree with the circuit court's ruling and find that the totality of the circumstances in this case leads to the inescapable conclusion that defendant's previous <u>Miranda</u> warnings were not so remote and stale that he was not aware of his constitutional rights to silence and to an attorney at the time of the videotaped statement. In our view, the events that occurred during the passing of those approximately 18 hours between the administration of warnings are of particular importance in analyzing the totality of the circumstances in the case <u>sub</u> <u>judice</u>. The record reflects that after twice receiving full <u>Miranda</u> warnings, there were two periods of questioning during which defendant gave detailed and lengthy accounts of the events on January 8, 1993. Defendant was also given breaks and allowed to use the bathroom. It is not clear whether defendant chose to eat during this period of time, but he was given a bottle of water to drink and he was allowed to use the bathroom at will and sleep from approximately 7 a.m. to approximately 3 p.m. on May 17. In summary, after being warned of his constitutional rights at 10:30 p.m. on May 16, the record shows that defendant gave statements for approximately seven hours, slept for about eight hours and had periodic breaks within that 18-hour time frame.

We cannot agree with the circuit court that a substantial probability exists that defendant became unaware of his rights following an 18-hour period of time wherein he gave detailed

18

statements of his involvement pursuant to a valid waiver of his rights and spent a majority of those hours sleeping and taking breaks between interviews. Also, defendant was reminded of his constitutional rights and waiver thereof several times during this period. In defendant's videotaped statement, McHale asked defendant: "Jim, before we spoke, I advised you of your constitutional rights, is that correct?" and defendant answered "yes." Defendant acknowledged McHale's reference to the constitutional rights and did not suggest that he had forgotten what rights McHale was referring to or ask that the question be clarified. More importantly, defendant signed a consent to videotape form prior to the commencement of his statement which gave defendant the option of remaining silent. Defendant stated that he was aware of his right to remain silent and referenced the consent form on videotape where he said:

> "[DEFENDANT]: A. And on number 1, it gave me the option to not say anything if I didn't - -
>
> [ASSISTANT STATE'S ATTORNEY]: Q. Okay, what part of it?
>
> Q. I think one. That I don't have to say anything - - right to remain silent."

Although we clearly state here that "reminders" are no substitute for full Miranda warnings when required by law, in a totality of the circumstances analysis where a circuit court must decide whether previous warnings were so stale that defendant had forgotten his constitutional rights, a reminder is not wholly

19

irrelevant.

We find it equally as import to the totality of the circumstances analysis that nothing occurred in the 18 hours that would have led defendant to believe that the nature of his detainment or questioning had changed. Defendant was never released from custody and thus led to believe that the interrogation had ceased. Upon arrival at the Streamwood police department, he was Mirandized and it was clear that he was neither a witness nor an informant. Defendant was the focus of the investigation as a suspect and this focus did not change during the relevant time period. Defendant gave more than seven hours of statements during which he detailed his and codefendant's involvement in the murders. Finally, defendant was not transferred to a new facility with new interrogators or questioned by different agencies which might have led to the conclusion that the previous interrogation had ceased and his waiver of rights had become ineffective.

We hold that the evidence demonstrates that defendant had not become unaware of his constitutional rights and knew that he was in custody and being interrogated as a suspect in the murders at issue following a valid waiver of his <u>Miranda</u> rights. A finding that the videotaped interview commenced following a sufficiently protracted period of time during which defendant had forgotten his constitutional rights is against the manifest weight of the evidence. As a result, the legal conclusion that a

20

Miranda violation occurred because McHale failed to initially re-advise defendant of his rights and, thus the entire videotaped statement should be suppressed, was incorrect.

III. Procedures for Videotaped Statements

Defendant further asserts that the entire videotape must be suppressed because: (1) it shows defendant actually exercising his right to silence which is in violation of Doyle, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; and (2) the State employed the impermissible "question first and give Miranda warnings later" technique prohibited in Seibert, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601. We disagree with defendant on both claims. First, the State conceded in its brief and at oral argument that allowing the jury to view defendant actually exercising his Miranda rights is improper and a violation of Doyle 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. The State does not seek to admit any part of the videotape that involves defendant attempting to exercise his constitutional rights. Therefore, the circuit court must determine at what point the videotaped statement will be stopped to avoid a Doyle violation.

Second, we find this matter to be easily distinguishable from Seibert. After being charged with first degree murder for her role in a disabled victim's death, Seibert sought to exclude both her prewarning and postwarning statements because she was questioned first until she gave an inculpating statement and then advised of her fifth amendment rights prior to giving a second,

redundant statement.  Seibert, 542 U.S. at 605, 159 L. Ed. at 650-51, 124 S. Ct. at 2606.  Seibert is distinguishable from this case for two reasons.  First, we have concluded that defendant here was previously and properly advised of his constitutional rights which extended to his videotaped statement prior to exercising his right to silence.  In Seibert, the defendant was not advised of her rights until she had given an incriminating statement.  Second, at the suppression hearing in Seibert, the interrogating officer testified that he made a " 'conscious decision' to withhold Miranda warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' "  The same officer further acknowledged that Seibert's ultimate statement was "'largely a repeat of information ... obtained' prior to the warning. [Citation.]"  Seibert, 542 U.S. at 605-06, 159 L. Ed. at 651, 124 S. Ct. at 2606.  The record in this case is devoid of any evidence that the State intentionally devised a plan to obtain a statement from defendant on videotape by tricking him into doing so without first receiving the proper warnings.

Notwithstanding our findings that the manner in which the videotaped statement was carried out was not in violation of Seibert, we must point out that commencing the process with Miranda warnings would have avoided any question as to the propriety of this statement.  In other words, this interlocutory

appeal would have been unnecessary if the State had advised defendant of his <u>Miranda</u> rights at the beginning of the videotape. More importantly, all parties concerned here would have avoided the lengthy delay in litigation and motions to expedite appeals and oral arguments if warnings had been issued first. Clearly, the better practice is to begin the memorialization of statements with full <u>Miranda</u> warnings.

                              CONCLUSION

For the foregoing reasons, we hold that the circuit court's ruling that defendant required fresh <u>Miranda</u> warnings was against the manifest weight of the evidence. The evidence in the record strongly supports the conclusion that defendant was aware of his rights at the commencement of the videotaped statement. As a result, the statement given by defendant prior to the exercise of his constitutional rights was not a violation of <u>Miranda</u> and the first portion of the videotaped statement is admissible. Accordingly, the judgment of the circuit court is reversed and remanded for the court to determine what portion of the remainder of the statement will be viewed by the jury in light of defendant's constitutional right not to testify.

Reversed and remanded with directions.

McBRIDE, P.J., concurs.

JUSTICE McNULTY, dissenting:

The videotape that prosecutors seek to use against defendant in this case shows that defendant exercised his right to silence

23

1-07-2784

once the interviewing officer reminded defendant of his <u>Miranda</u> rights. The trial judge found that the defendant's response to the warnings showed a substantial possibility that he had become unaware of the full range of his constitutional rights by the time the videotaping began. See <u>Garcia</u>, 165 Ill. 2d at 426. The judge concluded that the <u>Miranda</u> warnings, last given 18 hours before the videotaping, had grown stale. The finding accords with the manifest weight of the evidence. The failure to repeat the warnings before beginning to videotape, under the circumstances of this case, violated <u>Miranda</u>. Therefore, the trial court correctly disallowed the videotape as part of the prosecution's case-in-chief. I would affirm the trial court's decision. I respectfully dissent.

| | |
|---|---|
| **TITLE**<br>**of Case** | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>JAMES DEGORSKI,<br><br>Defendant-Appellee. |
| **Docket No** . | 1-07-2784 |
| **COURT** | Appellate Court of Illinois<br>First District, Sixth Division |
| **Opinion**<br>**Filed** | March 31, 2008 |
| **JUSTICES** | JUSTICE O'MALLEY delivered the opinion of the court:<br>McBRIDE, P.J. concurs; McNulty, J. dissents |
| **Appeal's**<br>**Origination** | Appeal from the Circuit Court of Cook County.<br>The Hon. Vincent M. Gaughan, Judge Presiding. |
| **Counsel for**<br>**APPELLANTS** | For Appellants, Richard A. Divine, State's Attorney, County of Cook, James E. Fitzgerald, Thomas Biesty, Linas Kelecius, Alan J. Spellberg, Assistant State's Attorneys, of Counsel, Chicago, IL. |
| **Counsel for**<br>**APPELLEES** | For Appellees, Edwin A. Burnette, Public Defender of Cook County, Lester Finkle, Mark Levitt, Assistant Public Defenders, of Counsel, Chicago, IL. |