2021 IL App (1st) 171623-U

No. 1-17-1623

Order filed March 31, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 12051 (01) |
| | ) | |
| KENYON JONES, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for first-degree murder where his trial counsel was not ineffective for failing to file a motion to suppress his inculpatory statements to the police based on an invalid *Miranda* waiver, stale *Miranda* warnings and his statements being involuntary due to the circumstances of his detention and the police's interrogation tactics where filing motions to suppress on those bases would have been futile.

¶ 2    Following a jury trial, defendant Kenyon Jones was found guilty of first-degree while

armed with a firearm. The trial court subsequently sentenced him to 23 years' imprisonment for

the murder as well as an additional mandatory 15-year firearm enhancement for a total of 38 years' imprisonment. On appeal, defendant contends that his trial counsel was ineffective where counsel failed to file a motion to suppress his inculpatory statements to the police based on an invalid *Miranda* waiver, stale *Miranda* warnings and his statements being involuntary due to the circumstances of his detention and the police's interrogation tactics. For the reasons that follow, we find that defense counsel was not ineffective and affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Defendant's Arrest and Interrogation

¶ 5     On the night of December 3, 2014, the police apprehended defendant after he ran from a vehicle that had been involved in the shooting of Damond Avant. Upon being apprehended, officers transported defendant to the police station. En route, defendant threw up. At 11:25 p.m. that night, Chicago Police Detective Greg Swiderek and Detective Marco Garcia placed defendant in an interrogation room. After defendant told them that he was cold, had a cold and felt "sick as hell," the detectives left the room. For roughly the next hour, defendant, who was wearing a jacket, sat handcuffed to a bench of a 10-foot by 12-foot brightly lit, windowless room, in which noise from outside the room could easily be heard. At 12:20 a.m. on December 4, Detective Swiderek removed defendant's handcuffs. Defendant told Detective Swiderek that he "didn't kill nobody" and "ain't do s***." Detective Swiderek responded that that they would talk in a few minutes. Defendant was then taken out of the room and returned about 20 minutes later without his jacket and wearing just a short-sleeve shirt. When he returned, he told an officer that he was "sick as hell," "freezing" and needed some water. Defendant sat back on the bench and put his arms inside his shirt to keep warm. For about 90 minutes, defendant sat on the bench in the room alone, appearing cold and occasionally coughing, except for a brief moment when an officer brought him

a bottle of water. Defendant asked the officer what was happening, and the officer told him to just wait a few more minutes.

¶ 6     At 2:07 a.m. on December 4, Detective Swiderek and Detective Garcia entered the room. Detective Swiderek told defendant that he was at the police station because of a shooting on Mayfield Avenue in Chicago. Detective Swiderek told defendant that, before they could talk, he needed to inform defendant of his rights. Defendant asked why he needed to be read his rights when he did not do anything. Detective Swiderek told defendant he was under arrest and at the police station for an investigation. Detective Swiderek asked defendant if he had been read his rights before, but defendant denied ever having them read to him before. Detective Swiderek asked if defendant had heard of them from television and defendant responded "[y]eah, I mean I know like" before Detective Swiderek interjected and asked "[y]ou know what they are, right?" Defendant replied "[y]eah, yeah, yeah, that's what I'm saying." Detective Swiderek reiterated that defendant was in custody because of the shooting and that before they could talk, he had to read defendant his rights. Detective Swiderek proceeded to tell defendant he had the right to remain silent and asked if he understood that right. Defendant initially responded "[u]h-huh" but then said "[y]es." Detective Swiderek next told defendant that anything he said could and would be used against him in a court of law, and asked if he understood that right. Defendant responded "[y]es." Detective Swiderek told defendant that he had the right to an attorney with him while he talked to the police and asked if he understood that right. Defendant responded "[y]es." Finally, Detective Swiderek told defendant that, if he could not afford an attorney, "the court" would provide him one for free. Detective Swiderek asked if defendant understood that right, and he responded "[y]es." Detective Swiderek asked defendant if he wanted to tell him what happened, and defendant proceeded to talk.

¶ 7     Defendant initially denied being in the burgundy vehicle at the time of the shooting. He explained that, after he had sold marijuana to a woman and smoked some of it with her, he entered the burgundy vehicle and immediately afterward, the police began chasing them. As defendant continued to deny being in the vehicle at the time of the shooting, the detectives told him it was impossible based on the known timeline that he could have been picked up between the shooting and when the vehicle was first spotted by the police. Detective Swiderek asserted that maybe defendant was not the shooter, but stated that someone in that vehicle shot another person. Detective Swiderek added that maybe defendant did not know what was going to happen, but he would want to "help [himself] out here." Defendant told the detectives that Paris Jones, his younger cousin, was driving the vehicle and there were other people inside that defendant did not know well. The detectives brought up defendant's younger brother, Brandon, who was killed four years ago, and defendant remarked that Brandon's birthday was December 3. Detective Swiderek observed that those facts "don't look so good." As they continued to talk, defendant remarked that he had drank Patron and smoked marijuana earlier in the night. Detective Garcia said that "it makes a lot of sense that you're gonna drink ***, be in a truck and you see some rival dudes down the street." Defendant, however, observed that it had been four years since his brother's murder, and he was not looking for revenge. During this initial conversation, the detectives informed defendant that they were also talking to Jones about the shooting, and he was telling them information. At 2:44 a.m., the detectives stopped interviewing defendant. For the next two hours, defendant was alone in the room, where he mostly laid down on the bench that did not fit his entire body.

¶ 8     At 4:49 a.m., Detective Swiderek and Detective Garcia entered defendant's interrogation room and talked to him for about 20 minutes. The detectives and defendant discussed who was present in the vehicle, and defendant acknowledged that his cousin Charlie was present. Defendant

confirmed that Charlie and Jones were members of the Unknown gang faction. Defendant maintained that he did not know anything about the shooting and insisted that he was drunk in the vehicle and not really paying attention to what was going on. Later during the conversation, defendant admitted being in the vehicle asleep and awaking to gunshots followed by a guy named "TY" and another guy named "YG" jumping back into the vehicle with guns. Defendant told the detectives that he had no clue they had firearms on them, and when they came back inside, defendant said he cussed them out. The detectives implored defendant to tell them the truth and noted that he was the oldest of the occupants of the vehicle. Detective Swiderek observed that "the leader [is] the oldest dude [who] tells everybody what to do." But defendant continued to deny any knowledge of a shooting. He did confirm to the detectives that a member of the Great Lakes gang faction was responsible for killing his brother. As the detectives left the room at 5:13 a.m., Detective Swiderek gave defendant a jacket to wear because the one he wore to the police station had to be tested. From 5:13 a.m. until 8:04 a.m., defendant was alone in his room and for most of that time, he was lying on the bench and apparently sleeping.

¶ 9    At 8:04 a.m., Detective Swiderek and Detective Garcia re-entered the room. During this conversation, the detectives confronted defendant about a receipt for a gun found in his wallet. Defendant said the receipt was for a firearm his girlfriend had bought a couple days before the shooting. At first, he denied having the firearm on him the night of the shooting, but then admitted he had it. Detective Swiderek informed defendant that Jones said that his firearm was used in the shooting and that defendant gave the firearm to one of the other occupants of the vehicle who did the shooting. Detective Swiderek reiterated to defendant that the facts "ain't gonna look good" for him. Later, Detective Garcia asked defendant why Jones would tell the detectives that defendant passed the firearm back to the other occupants, but before defendant could answer Detective

Swiderek interjected and asked another question. Ultimately, defendant told the detectives that he told Charlie to hold the firearm and Charlie must have given the gun to TY or YG. The conversation lasted until around 9 a.m. From that time until 11:20 a.m., defendant was alone, and he rotated between sitting on the bench and standing. He also left the room to use the bathroom.

¶ 10     From 11:20 a.m. to 11:41 a.m., defendant continued to talk to Detective Swiderek and Detective Garcia. From 11:41 a.m. until 4:09 p.m., for the most part, defendant was in the room alone except for brief moments when he was brought food and drink. At one point during this block of time, Detective Garcia came in and gave defendant a padded mat on which to lay down. During this brief entry, defendant asked if he was being charged with anything. Detective Garcia told him that everything was still being reviewed, and the police were looking for the other occupants of the vehicle. At 4:09 p.m., Detective Garcia re-entered the room and told defendant that Jones had given him more information about the shooting, which corroborated the police's theory of retaliation for the murder of defendant's brother. Detective Garcia and defendant proceeded to discuss the incident for approximately 30 minutes, wherein defendant conceded that he passed a firearm back to TY and YG. But in doing so, defendant believed they were just "talking and woofing like they always do, just not finna do s***." At 4:38 p.m., Detective Garcia left the room. From that time until 8:33 p.m., defendant was alone in the room.

¶ 11     At 8:33 p.m., Detective Swiderek entered the room and introduced Detective Michelle Wood, who would "take care" of defendant while he was away. They left a minute later. Defendant remained alone in the room until 11 p.m. when Detective Wood and Detective Art Taraszkiewicz entered and asked defendant to repeat his version of events for them. As the three discussed the incident, defendant told them where the group had been driving. Detective Taraszkiewicz mentioned that the area was the turf of the Great Lakes gang faction, which defendant confirmed.

Detective Taraszkiewicz asserted that defendant had been consistent that he did not shoot a firearm that night. However, Detective Taraszkiewicz noted he was having a hard time believing defendant's story that he just passed a firearm back to TY and YG in light of it being the birthday of defendant's late brother and the group driving through Great Lakes gang territory. Detective Taraszkiewicz then asked defendant "you guys were going over there looking for trouble one way or another. Is that fair to say?" Defendant responded that was a "fair" statement.

¶ 12    After defendant denied knowing what TY and YG were going to do with the firearm when he passed it back, Detective Wood and Detective Taraszkiewicz continued to press defendant and assert he must have known given the circumstances that they could possibly shoot someone. Defendant responded "[y]eah that's why I start like you know how you know it's a possibility." Defendant explained that TY and YG were arguing over one gun they had, and one of them asked to see his gun, so he passed it back. When asked by Detective Wood why they wanted defendant's gun, defendant responded "I guess evidentially so he can get on some bulls***." As defendant continued talking with the detectives, he made some statements indicating he was surprised that TY and YG got out of the car and began shooting, and other statements indicating that he knew what TY and YG could do with his firearm while driving through rival gang territory. During the conversation, the detectives repeatedly told defendant that Jones was telling them a different story, including stating that defendant knew TY and YG were going to shoot someone. Eventually, at 12:39 a.m. on December 5, Detective Taraszkiewicz left the room. Detective Wood had left the room several minutes earlier.

¶ 13    From 12:39 a.m. until around 9:48 a.m., defendant was in the room alone, appearing to be asleep on the cushioned mat for the majority of that time. At 9:48 a.m., Detective Garcia briefly came in the room with food and a drink for defendant. Defendant knocked on the door a few

minutes later to use the restroom and left the room. When he returned, Detective Garcia asked for defendant's consent for a buccal swab to obtain his DNA. Defendant agreed to the test. Over the next hour or so, Detective Garcia came in and out of the room, once to photograph defendant, another time to take his fingerprints and obtain his DNA, and another time to give defendant a cigarette. During the last visit, defendant asked Detective Garcia what was happening, and Detective Garcia responded that he should find out in the next few hours. For the next hour, defendant sat on the cushioned mat in the room.

¶ 14    At 12:11 p.m., Detective Swiderek and Detective Garcia came back in the room and began speaking with defendant, who proceeded to repeat many of the things he told Detective Taraszkiewicz and Detective Wood. Initially, defendant stated that while they were driving around, TY and Kosta, who was the same person as YG, got out of the vehicle and shot someone, which he could tell based on the gunshots and the flash of the gun. During the conversation, the detectives brought up that the group was driving through rival gang territory and the fact that December 3 was the birthday of defendant's late brother. They also made multiple references to what Jones had told them about the incident. When Detective Swiderek asked defendant what he thought TY and Kosta would do once he passed the firearm back to them, defendant responded that he "kn[e]w for a fact it's a chance that they could shoot somebody." Detective Swiderek followed up and asked why the group would drive through rival gang territory, defendant stated to "get on some bulls***," which he explained could mean "to shoot somebody." Defendant further mentioned that TY and Kosta were in the back talking about a guy named "Teema," who was a friend of theirs that had been killed by members of the Great Lakes gang. Toward the end of the interview, defendant reiterated that he believed Kosta was the shooter, but that he and TY were acting impulsively, and defendant could not stop them. The detectives left the room around 1 p.m.

¶ 15                                    B. Indictment and Pretrial

¶ 16    A grand jury indicted defendant and codefendants Paris Jones and Tyren Reese with several counts, including first-degree murder for shooting and killing Damond Avant while armed with a firearm. Defendant's codefendants were tried separately and are not a party to this appeal. The case proceeded to a jury trial.

¶ 17                                    C. The State's Case

¶ 18    At trial, the State's evidence showed that, at around 9:30 p.m. on December 3, 2014, Takia Martin and Avant were walking toward Martin's house along Mayfield Avenue in Chicago. As they passed an abandoned house, Martin observed two men appear from a gangway next to the house. One of the men was thin while the other was heavyset, but both men wore black hoodies. The men turned down an alley and disappeared, and Martin was never able to see their faces. As Martin and Avant reached that alley, she saw a big burgundy vehicle drive away. Martin and Avant continued to walk down Mayfield Avenue for another block and a half when Martin noticed the vehicle again. They walked another block or so when Martin heard the door of a vehicle open behind them. Suddenly, the heavyset man she saw in the gangway approached Avant and shot him. Then, another man who was with the heavyset man approached Avant and shot him multiple times. Both men got into the burgundy vehicle and they drove off. Martin again did not get a good look at their faces. Avant was taken to the hospital and died from his wounds.

¶ 19    Chicago Police Officer Jorge Munoz was on patrol around 9:30 p.m. that night, and as he approached Mayfield Avenue, he saw a burgundy vehicle traveling fast and run through a stop sign. Officer Munoz activated his emergency lights and sirens, and pulled the vehicle over. As he and his partner approached the vehicle, Officer Munoz observed four or five people inside. When Officer Munoz asked to see the driver's hands, the vehicle took off. Officer Munoz's partner

subsequently alerted other officers about the vehicle. Chicago Police Officer Richard Corona responded to the alert, and as he drove to the area where the vehicle was last seen, he observed the burgundy vehicle moving at a high rate of speed. Officer Corona pursued the vehicle with his lights and sirens activated. The burgundy vehicle eventually crashed in an alley, causing its airbags to deploy and causing the vehicle to begin smoking. Two or three men exited the vehicle from the driver's side and began to run. Officer Corona ran after them and apprehended defendant after a 10 to 15 second chase. When Officer Corona returned to the site of the crash with defendant, he observed that other officers had detained Paris Jones, who had also exited the burgundy vehicle. The police subsequently transported defendant to the police station. On the way, he threw up in the police vehicle.

¶ 20    Chicago police evidence technicians arrived at the scene of the shooting and recovered seven nine-millimeter fired cartridge cases. They then went to the scene of the crash, where they observed the burgundy vehicle. But there was too much to process at the scene, so the vehicle had to be towed. Afterward, the evidence technicians went to the hospital, where they obtained a fired bullet that had been found in Avant's body. The stipulated testimony of a medical examiner established that Avant had been shot seven times, six times on the right side of his head and once in his right thigh. The medical examiner determined the cause of death was multiple gunshot wounds. During the autopsy, the medical examiner found four deformed bullets in Avant's body, which were subsequently turned over to the Chicago police.

¶ 21    Chicago Police Detective Greg Swiderek was assigned to the murder investigation of Avant on the night of December 3, 2014. He stayed at the police station because defendant and Jones had been placed into custody, and Martin was also coming to the police station to be interviewed. Once defendant arrived, he was placed into an interview room. Once in the interview

room, at 11:25 p.m. that night, Detective Swiderek activated the video recording equipment in defendant's room. Detective Swiderek and his partner, Detective Marco Garcia, first introduced themselves to defendant at around 2 a.m. on December 4. At that time, Detective Swiderek also advised defendant of his *Miranda* rights, who indicated he understood each right. Detective Swiderek then asked defendant if he wanted to tell him what happened. Defendant proceeded to discuss the incident. While interviewing defendant, the detectives were also going back and forth into Martin's room and Jones' room.

¶ 22    Around 8 a.m. on December 4, Detective Swiderek asked defendant about a receipt found in his wallet for an Arcus nine-millimeter firearm and ammunition that had been purchased on December 1, 2014, in Indiana. Defendant claimed that his girlfriend bought the firearm. When asked where the firearm was currently, defendant said it "[s]hould be out there." Detective Swiderek and his partner went home around 10 p.m. that night. In the early morning hours of December 5, officers executed a search warrant on the burgundy vehicle, and they found a Ruger nine-millimeter pistol, an Arcus nine-millimeter pistol and a Tanfoglio .25-caliber pistol. Officers also found empty pill bottles, empty bottles of alcohol and a receipt for a Hi-Point .380-caliber firearm that did not match any of the firearms recovered from the vehicle.

¶ 23    Detective Swiderek returned to the police station around 10 a.m. on December 5. Shortly after noon that day, he re-interviewed defendant. A portion of this interview was played at trial for the jury. During the interview, defendant said that he was at his grandmother's house watching an NBA game when his cousin, Jones, repeatedly called him to hang out. Defendant drove his girlfriend's vehicle and met up with Jones along with defendant's cousin Charlie, someone named "TY" and someone named Kosta. They went to a liquor store, bought some Patron and drove back toward their neighborhood. On the way back, TY told Jones, who was driving, to pull into an alley.

TY left the car for a second and then returned. At this point, defendant did not see TY with a firearm. TY said aloud that the group should "ride through op ville," which was short for rival gang territory, in particular the territory of the Great Lakes gang faction. Defendant acknowledged that some of the occupants of the vehicle were members of the Unknown gang faction, and he confirmed to Detective Swiderek that the man who killed his brother was in the Great Lakes gang. As the group continued to drive, TY and Kosta began arguing about a firearm. One of them asked defendant if he could see defendant's firearm. Defendant had the firearm with him for protection, explaining that he did not trust anyone. At first, defendant said "hell no," but as TY and Kosta continued arguing over the gun, defendant took out his firearm, which was the one his girlfriend had recently bought, and let them see it. When pressed by Detective Swiderek about what he thought Kosta and TY would do with the firearms, defendant stated "I know for a fact it's a chance that they could shoot somebody" given they were driving to rival gang territory. Detective Swiderek followed-up and asked "[s]o that's why there were arguing over the gun who was gonna do the shooting, right? Defendant responded that Detective Swiderek was correct.

¶ 24     As the group continued to drive around, TY and Kosta began talking about a friend of theirs, Teema, who had been killed by Great Lakes gang members. As they drove around, defendant observed a man and a woman, and that's when TY and Kosta "just bailed up out" of the vehicle and shot their firearms. Meanwhile, Jones, defendant and Charlie stayed in the vehicle. After the shooting, TY and Kosta came running back to the vehicle and told Jones to drive. When they returned, Kosta said he shot someone in the face. This caused defendant to snap, and he told Detective Swiderek that he "wanted [Kosta and TY] out of my s***." Shortly after driving away, the police pulled them over. But as officers attempted to approach their vehicle, Kosta told Jones to drive away and they took off. As they were driving away from the officers, defendant wanted

to get out of the vehicle because he was not "for this high speed chase s***" and was not "for the **** they just did." Defendant told Detective Swiderek that he only stayed because the vehicle belonged to his girlfriend and he was worried about the consequences for her. During this time, Charlie and Kosta jumped from the vehicle, and Jones ended up crashing a short time later.

¶ 25    Toward the end of their interview, Detective Swiderek attempted to summarize the events that transpired with defendant. Detective Swiderek recalled that defendant and his group were celebrating the birthday of defendant's brother, the mood changed at some point and "those guys decided they were gonna go do a shooting." Defendant responded that he was "[c]orrect." Detective Swiderek then stated that "they needed another gun," and defendant responded that he was "[c]orrect." Defendant, however, stated that "s*** wasn't supposed to go like that, it actually wasn't, you know what I'm saying, but it's like they took it as upon they own self." But defendant explained that he could not just leave because it was his girlfriend's vehicle and her firearm inside. Although defendant was adamant that he did not shoot anyone, Detective Swiderek confirmed that he "knew [Kosta and TY] were going to shoot some dude, right?" Defendant responded, "[k]new they was, yeah, correct. Pretty much."

¶ 26    All told, according to Detective Swiderek, defendant had been in custody for approximately 35 hours before he was interviewed again on December 5 around noon. Defendant's room was 10 feet by 12 feet with no clock and no windows. In order for defendant to use the bathroom, he had to knock on the door and be escorted to the bathroom. At trial, Detective Swiderek agreed that, during the portion of the interrogation played for the jury, he never asked defendant how he knew TY or Kosta, and did not mention if defendant was going to be charged with a crime.

¶ 27    Based on the stipulated testimony of various experts, it was established the seven nine-millimeter cartridge cases found at the scene of the shooting had been fired from the Arcus nine-millimeter pistol, the fired bullet found in Avant's body had been fired from the Arcus nine-millimeter pistol, and one of the deformed bullets in Avant's body that the medical examiner found had been fired from the Ruger pistol. The other three deformed bullets were too damaged for analysis.

¶ 28                                    D. The Defense's Case

¶ 29    In the defense's case, defendant testified that, in December 2014, he was 33 years old and worked as a barber. On December 3, he had a doctor's appointment for bronchitis and received medicine for the condition. One of the side effects of the medicine was drowsiness. At trial, defendant identified two of his medicine bottles shown in photographs of the inside of the burgundy vehicle taken by the police. Later on December 3, defendant was watching the Chicago Bulls basketball game when his cousin, Jones, called him to hang out. Defendant sometimes stayed in Indiana and sometimes stayed in Chicago. This night he was hanging out in Chicago, in part, to celebrate the birthday of his late brother, Brandon, who had been killed four years earlier by someone named "Dammo," who was affiliated with the Great Lakes gang. Defendant took his girlfriend's vehicle and drove to a barbershop to pick up Jones.

¶ 30    In the vehicle, there was a firearm that defendant's girlfriend had bought two days earlier. She kept the firearm inside the vehicle because she could not take it inside her house. At the time, defendant had the receipt for the firearm in his wallet. There was also another receipt for a firearm in the vehicle that belonged to defendant's girlfriend, but the gun had been stolen, which was the impetus for her buying the new one. At the barbershop, Jones was with Charlie, TY and Kosta. Although defendant knew TY and Kosta, he did not know them very well, as they were closer with

Jones and Charlie. All five of them were hanging out when they decided to go to a liquor store. Jones drove because defendant "was intoxicated and tired." When they arrived at the liquor store, defendant went inside and bought several pint-sized bottles of Patron.

¶ 31     When defendant returned to the vehicle, Jones was on the phone with defendant's mother and playing with the firearm of defendant's girlfriend. Defendant told Jones not to tell his mother that "they with me" and at that point in the night, the mood changed with Jones, TY and Kosta. Jones finished the conversation with defendant's mother, and defendant took the firearm away from Jones. The group began driving around, drinking the alcohol, smoking marijuana and listening to music. Jones continued driving while defendant was in the front passenger seat. Meanwhile, Charlie, Kosta and TY were in back. While they were driving, TY told Jones to take him to a nearby building. TY briefly left the vehicle and when he returned, he and Kosta began arguing. At first, defendant did not understand what they were arguing about, but later, it became clear to defendant they were arguing over a firearm. While they were bickering about the firearm, defendant mostly ignored them and listened to the music. Around this time, TY was also talking about going to "Oppville," in particular rival gang territory that belonged to the Great Lakes gang.

¶ 32     Then, TY and Kosta asked to see defendant's firearm. Defendant asked why multiple times, but eventually put the gun on the center console and one of them grabbed it. Defendant was just "trying to enjoy" himself and listen to the music, so when he let them see the firearm, it was more so he could continue relaxing. At trial, defendant explained "it was never no plan of doing anything." When asked by defense counsel if the request from Kosta and TY occurred before anyone in the vehicle talked about going into rival gang territory, defendant testified that it was "along the same discussion." Though defendant also explained that he thought Kosta and TY were just going to look at the firearm and "there never was a conversation about doing anything." As

they continued driving around, Kosta and TY jumped out of the vehicle, but defendant did not know why they decided to jump. Before jumping, defendant could hear them making noise, but he could not understand what they were saying. Defendant attempted to persuade Kosta and TY to stay in the vehicle, but it was too late. At trial, defendant was adamant that he had no idea they were going to jump out of the vehicle and shoot someone.

¶ 33    Eventually, after the shooting, defendant was taken into custody. From the night of December 3 into the afternoon of December 5, defendant was in the interrogation room. Defendant was not interviewed continuously while the room, and the police brought him food. They also provided him a mat so he could lay down and sleep. However, while defendant was there, he had no idea what time it was. And in order to use the bathroom, he had to knock on the door or yell, but the officers would not respond immediately. When defendant talked to the police, he thought he was there to help them solve the murder, though he acknowledged at trial that he received *Miranda* warnings before speaking. Additionally, at trial, defendant conceded that, during the interview with Detective Swiderek, he stated he knew there was a chance that Kosta and TY could shoot someone given they were driving through rival gang territory. When asked by his defense counsel to explain that answer, defendant stated he "was just saying like I know for a fact that it's a chance that something could happen because of what happened. I didn't know that something was going to happen."

¶ 34                              E. Verdict and Sentencing

¶ 35    Following the parties' closing arguments, the jury found defendant guilty of first-degree murder and found that, during the commission of the offense, he was armed with a firearm. Defendant subsequently filed an unsuccessful motion for new trial, and his case proceeded to sentencing.

¶ 36    Defendant's presentence investigative report (PSI) revealed that he was 33 years old at the time of the offense and had a lengthy criminal record dating back to his late teens, which included multiple drug convictions. In the PSI, defendant reported that he had obtained a high school diploma, but a high school transcript showed he did not have enough credits to graduate. From 2011 to 2014, defendant stated that he was enrolled in a training program in Chicago where he studied "computerized manufacturing and CNC (Computerized Numerical Control) Mills." Prior to his arrest, he supported himself as a barber. Defendant further reported that he did not use alcohol frequently and did "not get intoxicated," but he did regularly use marijuana. Defendant reported that he never had any mental health issues, which, according to the PSI, his mother confirmed.

¶ 37    Following the parties' arguments during defendant's sentencing hearing, the trial court sentenced him to 23 years' imprisonment for the murder as well as an additional mandatory 15-year firearm enhancement for a total of 38 years' imprisonment.

¶ 38    This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40    Defendant contends that he was denied the effective assistance of counsel where his defense counsel failed to seek suppression of his inculpatory statements to the police based on multiple different arguments. First, defendant argues that his waiver of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) was invalid where he did not understand them. Second, defendant argues that, even if his *Miranda* waiver was valid, his original *Miranda* warnings were so stale and remote 21 hours later when he made his inculpatory statements to Detective Wood and Detective Taraszkiewicz that he had become unaware of his rights. And finally, defendant

argues that his inculpatory statements were involuntary and resulted from the circumstances of his detention and the police's improper interrogation tactics, which deprived him of due process.

¶ 41    Under the United States and Illinois Constitutions, a defendant has the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In evaluating claims of ineffective assistance of counsel, the defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Gayden*, 2020 IL 123505, ¶ 27. Under the *Strickland* test, the defendant must demonstrate that his counsel's performance was deficient and that he was prejudiced by that deficiency. *Strickland*, 466 U.S. at 687. More specifically, the defendant must show that his counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unreasonable performance, the result of the proceeding would have changed. *Gayden*, 2020 IL 123505, ¶ 27. Both prongs of the *Strickland* test must be met for a finding of ineffective assistance of counsel. *Id.*

¶ 42    While a defendant is entitled to competent representation, he is not entitled to perfect representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). And to prove ineffective assistance of counsel, "the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). And generally, because of this strong presumption, "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.* An attorney's decision of whether to file a motion to suppress is generally a matter of trial strategy. *Gayden*, 2020 IL 123505, ¶ 28. To succeed on a claim that counsel was ineffective for failing to file a motion to suppress, "the defendant must demonstrate both that the unargued suppression motion was meritorious and

that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.*

¶ 43                                        A. *Miranda* Waiver

¶ 44    Defendant first argues that that his waiver of his rights pursuant to *Miranda*, 384 U.S. 436 was invalid where, at the time Detective Swiderek informed him of his rights, he did not understand them because of his mental and physical condition.

¶ 45    The fifth amendment to the United States Constitution, which applies to the states through the due process clause of the fourteenth amendment, protects against involuntary confessions by protecting the right against self-incrimination. U.S. Const., amend. V; *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). In *Miranda*, 384 U.S. at 444, the United States Supreme Court held that, prior to the start of an interrogation of a suspect in custody, he first must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The purpose of these warnings is to ensure that a suspect "is aware of his substantive constitutional right not to incriminate himself and to provide him with the opportunity to exercise that right." *People v. Winsett*, 153 Ill. 2d 335, 348 (1992). Although *Miranda* warnings are only necessary before custodial interrogation (see *People v. Villalobos*, 193 Ill. 2d 229, 232-33 (2000)), the State concedes that defendant was in custody and subject to interrogation.

¶ 46    "A valid waiver of Miranda rights must be knowingly and intelligently made." *People v. Braggs*, 209 Ill. 2d 492, 515 (2003). When a suspect waives his *Miranda* rights, he is "not required to know and understand every possible consequence of a waiver of the Fifth Amendment privilege for it to be knowingly and intelligently made." *Id.* The critical inquiry is whether the suspect was fully aware of the nature of the rights he waived and the ramifications of such a decision. *Id.* Stated

otherwise, "[t]he [suspect] need not understand far-reaching legal and strategic effects of waiving his or her rights or appreciate how widely or deeply an interrogation may probe; however, the [suspect] must at least understand basically what those rights encompass and minimally what their waiver will entail." *Id.* When determining whether a person understood his *Miranda* rights and made a knowing and intelligent waiver of them, we must consider the totality of the circumstances. *People v. Scott*, 148 Ill. 2d 479, 509 (1992). Factors include the suspect's background, experience and conduct. *Braggs*, 209 Ill. 2d at 515.

¶ 47    In this case, defendant was 33 years old at the time Detective Swiderek informed him of his *Miranda* rights. Given no suppression hearing was held in the trial court, defendant's characteristics and background were never fully established. However, defendant's PSI report showed that he had a high-school level education, no mental health issues and no reported intellectual disability. In other words, nothing about defendant's background, as established by the record on appeal, would demonstrate that extra care had to be given to defendant when being informed of his *Miranda* rights. See *People v. Wilson*, 2020 IL App (1st) 162430, ¶¶ 47-48 (observing that great care must be given to certain individuals when being informed of their *Miranda* rights, including most notably juveniles and people with intellectual disabilities).

¶ 48    Moving on from defendant's background, prior to arriving at the police station, he was involved in a vehicle crash so forceful that it caused the vehicle's airbags to be deployed, and he threw up in a police vehicle on his way to the police station. Defendant also had ingested some combination of medicine for his bronchitis, alcohol and marijuana earlier in the evening of December 3, 2014. While the exact amounts he ingested of these substances is unclear, he indicated to the detectives on multiple occasions that he was quite intoxicated that night. Although this must be juxtaposed with his PSI, in which he reported that he did not use alcohol frequently and did

"not get intoxicated." Regardless, the fact that a suspect is under the influence of alcohol or drugs at the time he waives his *Miranda* rights "does not automatically render his statements inadmissible." *People v. Foster*, 168 Ill. 2d 465, 476 (1995). Rather, a suspect's statements will only be suppressed based on alcohol or drug intoxication where he is "so grossly intoxicated that []he lacks capacity to waive [his] rights." *People v. Garcia*, 165 Ill. 2d 409, 422 (1995). The evidence must clearly establish that the suspect lacked the capacity to waive his *Miranda* rights due to his condition. *People v. Johnson*, 285 Ill. App. 3d 802, 812 (1996).

¶ 49     Based on the record before us, the evidence fails to clearly show that defendant lacked the capacity to waive his *Miranda* rights due to his condition. Notably, Detective Swiderek informed defendant of his *Miranda* rights shortly after 2 a.m., some 4 ½ hours after defendant's vehicle had crashed. See *id.* at 813 (affirming the trial court's finding that the defendant knowingly waived his *Miranda* rights where, although the 33-year-old defendant had "ingested alcohol and cocaine before his arrest, his first interview by the police was not until four hours later"). Furthermore, based on our review of the video evidence, there was nothing about defendant's behavior or appearance while Detective Swiderek informed him of his *Miranda* rights that demonstrated he was unable to understand his rights. For instance, when Detective Swiderek told defendant he had the right to remain silent, defendant asked "how I'm getting read my rights and I ain't do nothing though?" This exchange demonstrated defendant knew what *Miranda* rights were and understood the purpose of them even before Detective Swiderek read them to him. Later, when defendant asserted that, despite being in jail before, he had never been given *Miranda* rights, Detective Swiderek asked if he had heard them on television before. Defendant responded, "[y]eah, I mean I know like –" before Detective Swiderek interjected and asked "[y]ou know what they are, right?" Defendant replied, "[y]eah, yeah, yeah, that's what I'm saying." This exchange buttresses the

notion that defendant knew what *Miranda* rights were and understood the purpose of them even before Detective Swiderek read them to him. At this point, Detective Swiderek proceeded to read defendant each of his *Miranda* rights, and defendant responded each time that he understood the individual right. During this exchange, defendant did not hesitate in responding or ask for clarification about any of his rights, and there was no indication that he did not understand them.

¶ 50    Additionally, although defendant claimed he had never received *Miranda* warnings before, his criminal history belies that assertion given his multiple previous felony convictions. See *Garcia*, 165 Ill. 2d at 426 (observing the "defendant's broad experience with the criminal justice system" was further evidence that she understood her *Miranda* rights). Under the totality of the circumstances, defendant understood the basics of what the *Miranda* rights encompassed and what a waiver of those rights would entail. See *Braggs*, 209 Ill. 2d at 515. Because defendant understood his *Miranda* rights and knowingly waived those rights, had his defense counsel filed a motion to suppress based on his failure to understand his *Miranda* rights, that motion would have been unsuccessful. "The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). Consequently, defense counsel was not ineffective for failing to file a motion to suppress defendant's statements based on an invalid *Miranda* waiver.

¶ 51                    2. Staleness of *Miranda* Waiver

¶ 52    After concluding that defendant's *Miranda* waiver was validly made, we must address defendant's next argument that his original *Miranda* warnings were so stale and remote 21 hours later when he made his inculpatory statements to Detective Wood and Detective Taraszkiewicz that he had become unaware of his rights. As previously discussed, Detective Swiderek provided defendant his *Miranda* rights shortly after 2 a.m. on December 4. After being given his *Miranda*

rights and waiving those rights, Detective Swiderek and Detective Garcia interrogated defendant multiple times throughout the day. Eventually, at 11 p.m. that night—21 hours later—during an interrogation by Detective Wood and Detective Taraszkiewicz, defendant made his first statements that would support charges for first-degree murder based on a theory of accountability. Defendant then repeated those inculpatory statements the following day to Detective Swiderek and Detective Garcia upon a subsequent interrogation.

¶ 53    The police are not required to give new *Miranda* warnings to a suspect merely because several hours have passed since the initial warnings. *Garcia*, 165 Ill. 2d at 425. A different rule would lead to the "ridiculous situation" where the police would be required to give fresh *Miranda* warnings to suspects after each break in questioning. *Id.* at 425-26. Rather, the police are only required to provide new *Miranda* warnings "in those situations where a substantial probability exists that warnings given at a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs." *Id.* at 426. As with other *Miranda* issues, we must look at the totality of the circumstances in determining whether initial *Miranda* warnings have become sufficiently stale and remote. *Id.*

¶ 54    In this case, Detective Wood and Detective Taraszkiewicz were not required to give defendant fresh *Miranda* warnings before interrogating him. Although 21 hours had passed since Detective Swiderek advised defendant of his *Miranda* rights to when Detective Wood and Detective Taraszkiewicz interrogated him, such a lengthy passage of time does not mean fresh *Miranda* warnings were required. See *People v. Degorski*, 382 Ill. App. 3d 135, 146 (2008) (finding that the passage of 18 hours from the defendant's *Miranda* warnings and waiver to the time of his non-*Mirandized* inculpatory statements was not so stale or remote as to require fresh

*Miranda* warnings); *People v. Baltimore*, 292 Ill. App. 3d 159, 164 (1997) (finding that the passage of three days from the defendant's *Miranda* warnings and waiver to the time of his non-*Mirandized* inculpatory statements was not so stale or remote as to require fresh *Miranda* warnings).

¶ 55    It is true that, when defendant spoke to Detective Wood and Detective Taraszkiewicz, they were new interrogators. See *Degorski*, 382 Ill. App. 3d at 146 (observing that being interrogated by new police officers is a factor that weighs in favor of the need for fresh *Miranda* warnings). However, this fact is offset by the fact that defendant was never transferred to a different location for questioning, but rather remained in the same room except for brief bathroom breaks from the time he was *Mirandized* by Detective Swiderek until the time Detective Wood and Detective Taraszkiewicz interrogated him. See *Baltimore*, 292 Ill. App. 3d at 164 (noting that "[o]ther circumstances contribute to our determination that the defendant understood his rights carried over from the previous interview" including "[t]he place of interrogation [being] the same for both interviews"). Additionally, the subject matter of the interrogation, *i.e.*, the shooting investigation, remained the same throughout every questioning by the detectives. See *id.* And again, defendant had experience with the criminal justice system despite his assertion to Detective Swiderek that he had never received *Miranda* warnings before. See *Garcia*, 165 Ill. 2d at 426 (observing the "defendant's broad experience with the criminal justice system" was further evidence that she understood her *Miranda* rights and that fresh *Miranda* warnings were not required). Viewing these facts under the totality of the circumstances, a substantial probability does not exist that the initial *Miranda* warnings given to defendant became so stale and remote 21 hours later when Detective Wood and Detective Taraszkiewicz interrogated him that he became unaware of his rights.

¶ 56    Still, defendant argues that new *Miranda* warnings were required, in part, because he was repeatedly encouraged to believe he was a witness rather than a suspect. When an individual is the

focus of an investigation as a suspect and that "focus [does] not change during the relevant time period," that strongly weighs in favor of the suspect not needing to be re-*Mirandized*. *Degorski*, 382 Ill. App. 3d at 146. However, we disagree that defendant was encouraged to believe he was a witness rather than a suspect. When the police initially placed defendant in the interrogation room, he was handcuffed. And before Detective Swiderek informed defendant of his *Miranda* rights, Detective Swiderek told him that he was "under arrest" and "here for an investigation" of a shooting. Nevertheless, defendant points to one exchange between him and Detective Garcia, where he asked Detective Garcia why he was still in custody and what he was being charged with. Detective Garcia responded that everything was "just being reviewed" and the police were "still looking for the other dudes." Detective Garcia further remarked that he believed defendant was not the shooter. Nothing in this exchange was inaccurate or gave defendant the impression that he was not a suspect. For one, earlier in the interrogation, Detective Swiderek informed him that, due to the seriousness of the investigation, the police did not make charging decisions, but rather the State's Attorney's Office did. So when Detective Garcia informed defendant that everything was "just being reviewed," it was not meant to imply that defendant was merely a witness. And it was true that the police were still looking for the actual shooters, TY and Kosta (also known as YG). Furthermore, merely believing someone is not the shooter does not mean that the person is absolved of criminal liability, and Detective Garcia was not required to explain to defendant the law of criminal accountability. Detective Swiderek and Detective Garcia also repeatedly told defendant that several facts of the case did not look good for him, which they clearly would not tell someone who was merely a witness.

¶ 57    Defendant also points to his alleged lack of uninterrupted sleep before being interrogated by Detective Wood and Detective Taraszkiewicz as another reason fresh *Miranda* warnings were

required. While it is undeniable that defendant was contained inside a 10-foot by 12-foot brightly lit, windowless room, in which noise from outside the room can be heard, for the majority of the 21 hours between being *Mirandized* by Detective Swiderek and being interrogated by Detective Wood and Detective Taraszkiewicz, defendant was alone in the room. In fact, during those 21 hours, defendant was alone in the room for approximately 18 hours and being interrogated for 3 hours. While we cannot fathom that it would be easy to sleep under such circumstances, defendant had ample time to lay down and attempt to sleep, and based on our review of his time in custody, he did in fact fall asleep on multiple occasions for lengthy periods of time. Defendant's lack of ideal sleeping conditions is not a reason his initial *Miranda* warnings became stale and remote.

¶ 58    Because the detectives were not required to provide defendant fresh *Miranda* warnings, had his defense counsel filed a motion to suppress on that basis, the motion would have been unsuccessful. "The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *Patterson*, 217 Ill. 2d at 438. Consequently, defense counsel was not ineffective for failing to file a motion to suppress defendant's statements based on the staleness of his initial *Miranda* warnings.

¶ 59                                    3. Due Process Violation

¶ 60    Defendant lastly argues that his defense counsel was ineffective for failing to move to suppress his inculpatory statements based upon a violation of due process where the statements were not voluntary given the circumstances of his detention and the detectives' improper interrogation tactics. Specifically, defendant asserts that his inculpatory statements were obtained after he had been interrogated by four different detectives over the course of 36 hours where the detectives knew he was cold, sick, fatigued and undernourished. Additionally, defendant posits that he was subjected to mental coercion by the detectives, where they diminished the importance

of his *Miranda* rights, told him that prosecutors would assume he planned the shooting unless he explained his side of the story, made implicit and explicit promises of leniency in exchange for his inculpatory statements, and provided him with their theory of what happened that night, which created an atmosphere in which it was futile for him to do anything but confess.

¶ 61     Under the due process clause of the fourteenth amendment, no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV. The United States Supreme Court "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Thus, under the fourteenth amendment, due process demands the exclusion of involuntary confessions. *Richardson*, 234 Ill. 2d at 252.

¶ 62     It is undoubtedly true that people confess to crimes they did not commit. *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 40. "Some people confess from fatigue, stress, and being worn down through relentless questioning and sleep deprivation; some people confess out of fear; some people confess with the expectation of future exoneration; some people confess due to coercive or suggestive methods of interrogation." *Id.* But many people confess to crimes they did commit. *Id.* "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). In determining whether a defendant's confession was voluntary, we must consider his characteristics, including his age, background, intelligence, education, mental capacity and physical condition at the time of the interrogation, as well as external factors such as the duration of the detention and any allegations

of physical or mental abuse by the police, including threats and promises. *People v. Hughes*, 2015 IL 117242, ¶ 31. Additionally, we consider the defendant's ability to sleep while detained (*People v. Redd*, 135 Ill. 2d 252, 293 (1990)) and any disregard of the rudimentary necessities of life. *People v. Price*, 24 Ill. 2d 46, 57 (1962). In determining the voluntariness of a defendant's inculpatory statements, we look at the totality of the circumstances. *Richardson*, 234 Ill. 2d at 253.

¶ 63    As we discussed in our discussion of defendant's initial *Miranda* waiver, defendant's background, insofar as established by the record on appeal, does not present any special circumstances that we must consider in determining the voluntariness of his confession, such as being an individual with an intellectual disability or a juvenile, groups particularly susceptible to involuntary confessions. See *Braggs*, 209 Ill. 2d at 514; *In re G.O.*, 191 Ill. 2d 37, 54-55 (2000).

¶ 64    Turning to defendant's interrogation, having reviewed the entirety of his time in the interrogation room, including the detectives' interrogation of defendant, he confessed freely and voluntarily without compulsion or inducement and his will was not overborne at the time he made his inculpatory statements. What must be understood about the questioning from the detectives, in particular Detective Swiderek and Detective Garcia, is that defendant lied to them almost immediately upon their questioning. Initially, defendant denied being in the vehicle when the shooting occurred. But the detectives had already talked to Jones about the shooting, and they knew the timeline from the shooting occurring to the police pulling defendant's vehicle over. And from this information, they knew defendant was in the vehicle when the shooting occurred and knew defendant was already lying to them. It was under this context that guided the detectives' questioning of defendant and their constant demands for him to be truthful, especially coupled with Jones telling the detectives a different and evidently more plausible version of events than what they were hearing from defendant. The detectives were simply being zealous in their attempts

to obtain the truth from defendant. See *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 43 (observing it is proper for the police to be "zealous" in their "attempt to convince the defendant to tell the truth").

¶ 65     Defendant, however, argues that the detectives disregarded his rudimentary necessities of life, which in part caused his statement to be involuntary. While defendant occasionally had to wait to use the restroom, there was never an instance where he had to wait so long that he went in the interrogation room itself. It is unrealistic that defendant would be immediately escorted to the bathroom upon knocking in a setting like a police station. Defendant further highlights his alleged lack of sleep, but as noted during our *Miranda* discussion, defendant had ample time to lay down and attempt to fall asleep. While the conditions were not conducive to a deep and restorative sleep, he was nevertheless able to lay down and get some sleep. Similarly, although defendant asserts that he only ate two bites of food over the course of the 36 hours he was in the interrogation room, the police gave defendant food, he just chose not to eat it. For example, around 8 a.m. on December 4, after defendant had been in the room for around 8 ½ hours, the detectives asked him if he wanted anything to eat. Defendant said he did, but added that he did not know if food was "gonna go down." Detective Garcia asked if he wanted "[s]omething light," and defendant responded affirmatively. Furthermore, defendant told the detectives that he was cold and not feeling well. But, in response, Detective Garcia told him that it was relatively warm in the room, and Detective Swiderek gave defendant a jacket to wear because the one he wore to the police station had to be tested.

¶ 66     These are not examples of the detectives disregarding defendant's rudimentary necessities of life like what occurred in *Price*, 24 Ill. 2d 46, a case cited by defendant. In that case, hospital records showed that the defendant was suffering from second-degree burns and had a fever, but he

was nevertheless questioned for over two hours before receiving medical treatment. *Id.* at 57. In this case, defendant was dealing with bronchitis based upon his trial testimony, but he was given bathroom breaks, food, water and ample opportunities to sleep. Defendant was also never questioned for overly long periods of time and was not handcuffed except for a brief period of time upon entering the room. See *People v. Dodds*, 190 Ill. App. 3d 1083, 1091 (1989) (finding a defendant's inculpatory statements voluntary where he was given ample opportunity to sleep, albeit either on a chair or table, without interruption, "was not subjected to long periods of questioning, but rather, was afforded long breaks in between the brief interview sessions" and "[h]is requests for food, water, cigarettes and use of the lavatory were honored").

¶ 67    Defendant further claims that he was subjected to mental coercion by the detectives in various manners. First, he asserts that Detective Swiderek diminished the importance of his *Miranda* rights by suggesting they were a mere formality. "[T]he impact of the [*Miranda*] warnings" can be "significantly undermined by [a detective's] characterization that they were just a formality." *People v. Alfaro*, 386 Ill. App. 3d 271, 306 (2008). However, Detective Swiderek never stated or insinuated that the *Miranda* warnings he was about to give defendant were a formality. Rather, Detective Swiderek stated that he needed to provide defendant his *Miranda* rights before they could speak.

¶ 68    Defendant next claims that the detectives used minimization tactics and attempted to diminish the legal seriousness and moral seriousness of his actions. For instance, defendant highlights the many instances where the detectives remarked that they, too, would remember and seek vengeance on someone who murdered their brother. Defendant also highlights other instances where the detectives minimized the consequences of him handing back the firearm to TY and Kosta (aka YG) by telling defendant that he did not tell them to shoot. These minimization

techniques, according to defendant, acted as implied offers of leniency that he would receive if he cooperated. But " 'police are allowed to play on a suspect's ignorance, fears[,] and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible.' " *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990)). What the police cannot do is obtain confessions by fraud or trickery. *Id.* The so-called minimization techniques utilized by the detectives were nothing more than them properly playing on defendant's ignorance.

¶ 69    Defendant also argues that the detectives made more explicit promises of leniency in exchange for his inculpatory statements. "[A] confession is not *per se* inadmissible even where promises or suggestions of leniency have been made." *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34. But an offer of leniency is a factor courts will look at in determining whether a suspect's statement was voluntary. *People v. Ruegger*, 32 Ill. App. 3d 765, 769 (1975). "To constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if defendant confesses." *Johnson*, 285 Ill. App. 3d at 808.

¶ 70    Defendant highlights certain statements from the detectives, including one instance from Detective Swiderek where he told defendant that "you want to help yourself you better do a little better, okay?" However, this statement was directly in response to defendant denying he was in the vehicle when the shooting occurred, which directly contradicted the known timeline of events and Jones' statements to the detectives. The detectives were merely trying to get defendant to tell the truth. "[M]ere exhortation[s] to tell the truth does not render inadmissible a subsequent confession." *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977). Importantly, throughout the interrogation of defendant, the detectives were forthright with him and told him that they did not make charging decisions in the case, but rather it was up to the State's Attorney's Office. And,

critically, at no point did any of the detectives inform defendant of a specific benefit that would follow if he made inculpatory statements, such as escaping prison time. See *Kronenberger*, 2014 IL App (1st) 110231, ¶ 47 (concluding that a confession was voluntary where the detectives repeatedly told the defendant to tell the truth but never suggested to him that he would "escape legal consequences if he confessed").

¶ 71    Lastly, defendant asserts that the detectives provided him with a version of what happened they considered to be the truth, which created an atmosphere where it was futile for him to do anything but confess. Throughout the detectives' interrogation of defendant, they knew he was lying to them based on commonsense, what Jones was telling them and the timeline of events. In other words, defendant's version of events did not make sense based on what other information they knew. In this regard, the detectives were merely trying to obtain the truth from defendant by their repeated exhorts to tell the truth. See *Wipfler*, 68 Ill. 2d at 173 (observing that "mere exhortation[s] to tell the truth does not render inadmissible a subsequent confession"). As such, considering the totality of the circumstances, defendant's inculpatory statements to the detectives were voluntary. Had his defense counsel filed a motion to suppress based on his statements being involuntary, that motion would have been unsuccessful. "The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *Patterson*, 217 Ill. 2d at 438. Consequently, defense counsel was not ineffective for failing to file a motion to suppress defendant's statements based on them being involuntary.

¶ 72    Finally, we briefly note that, in multiple sections of defendant's opening brief, including the points and authorities and issues presented sections, he mentions that defense counsel was ineffective for failing to "provide meaningful support for the defense theory that the statements were too unreliable to prove [him] legally accountable for first degree murder where the statements

were obtained by coercive police interrogation tactics." And at the very end of his brief, in his "conclusion" section, defendant stated that "in addition to [defense counsel's] objectively unreasonable failure to file a motion to suppress [his] statements, counsel also erred because he did not provide any support for his argument that the statements were unreliable evidence of guilt where they were given only after a prolonged, coercive interrogation." But defendant fails to support this argument with any Illinois case law on the matter. Thus, to the extent that defendant argues that his defense counsel also performed objectively unreasonable during trial, we find such an argument forfeited due to the argument not being fully developed on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 73                                III. CONCLUSION

¶ 74    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 75    Affirmed.